## NATIONAL LABOR RELATIONS BOARD
### v.
### SHEDD–BROWN MFG. CO.
#### No. 11031.

United States Court of Appeals
Seventh Circuit.
May 17, 1954.

As Modified on Denial of Rehearing
June 17, 1954.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Clarence A. Meter, Arnold Ordman, Duane Beeson, and Mary E. Williamson, Attys., National Labor Relations Board, Washington, D. C., for petitioner.

Donald O. Wright, Minneapolis, Minn., for respondent.

Before DUFFY, SWAIM and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

This case is before the court upon the petition of the National Labor Relations Board, pursuant to section 10(e) of the National Labor Relations act, as amended, 61 Stat. 136, 29 U.S.C.A. § 160 (e), for enforcement of its order issued against Shedd-Brown Mfg. Co., respondent herein, on January 28, 1953, as clarified by its supplemental decision and order of March 23, 1953, following proceedings under section 10 of the act. The Board's decision and order are reported in 102 N.L.R.B. No. 69; its supplemental decision and order are reported in 103 N.L.R.B. No. 107. This court has jurisdiction of the proceeding under section 10(e) of the act, the alleged unfair labor practices having occurred in Eau Claire, Wisconsin, within this judicial circuit.

1. After briefs on behalf of the Board and the respondent were filed, respondent filed in this court a motion for an order directing the Board to take testimony "to produce evidence upon which a Finding of Fact can be based, covering the question of whether or not the United Paper Workers of America, C.I.O. had actually complied with Section 9(f), (g) and (h)" of said act on September 25, 1951, the date upon which the complaint was issued by the Board, and "evidence upon which a Finding of Fact can be based covering the question of whether or not the Congress of Industrial Organizations, the parent federation, of which United Paper Workers of America, C.I.O. is an affiliate or constituent member had actually complied with" said sections 9 (f), (g) and (h) of said act upon said date, and evidence upon which to base a similar finding of fact in reference to Eau Claire Industrial Union Council. We will first dispose of that motion.

The record before this court reveals that on December 7, 1950, United Paperworkers of America, C.I.O., filed with the Board a charge against Shedd-Brown Mfg. Co. This was followed by a "first amended charge" filed July 13, 1951, and a "second amended charge" filed September 20, 1951 by the same labor organization against the said company. Thereupon the Board issued a complaint, which constitutes the basis for the order which the Board now seeks to have this court enforce. An answer was filed by Shedd-Brown Mfg. Co., respondent, and a hearing was had before a trial examiner, to whose report excep-

tions were filed by respondent on July 29, 1952. The only exceptions which refer to the failure of any organization to comply with section 9(h) of the act are the following:

1. Respondent excepts to the Finding of Fact II "Labor Organizations Involved" (p. 2, L. 45) for the reason that the Examiner has failed to recognize the Eau Claire Industrial Union Council C.I.O., a labor organization in this proceeding.

15. Excepts to the Finding on p. 24, L. 7 entitled "The Alleged Failure to Comply with Section 9(f), (g), (h), of the Act", for the reason that here or somewhere else in the Findings the Examiner should have made a report to the Board of the activities of the Eau Claire Industrial Council C.I.O. in connection with the facts and circumstances of this case and should have found from the record that the Eau Claire Industrial Council was a labor organization and was designated by the United Paper Workers of America and empowered by it to conduct organizational activities at Respondent's plant.

It is not denied that the Congress of Industrial Organizations (C.I.O.) and United Paperworkers of America were and are labor organizations, that the C.I.O. is a national labor organization, and that the United Paperworkers of America is an affiliate or constituent unit thereof.

There was evidence at the hearing that the Eau Claire Industrial Union Council was engaged in organizational activities among the employees of respondent which led up to the formation of a local union of the United Paperworkers of America, and that the Council was a chartered and official body of the Congress of Industrial Organizations, in Eau Claire, Wisconsin. It was agreed by counsel upon the oral argument in this court that the Council officers have not complied with section 9(h) of the act, by filing non-communist affidavits with the Board.

The examiner in the intermediate report stated that he was "administratively satisfied that both the charging union and its parent organization have been in compliance at all times material herein".

It will be noted that no exception to the intermediate report was filed by respondent directed at alleged noncompliance with section 9(h) by either United Paperworkers of America or the Congress of Industrial Organizations. In the absence thereof, any question as to alleged noncompliance by those organizations, or either of them, was waived by respondent. The controlling statutory provision is found in section 10(e) of said act, 61 U.S. Statutes 136, at 148; 29 U.S. Code (1946), Supplement V; Section 160(e), 29 U.S.C.A., which provides as follows:

"* * * No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."

In Marshall Field & Co. v. National Labor Relations Board, 318 U.S. 253, at page 255, 63 S.Ct. 585, at page 586, 87 L. Ed. 744, the foregoing language was quoted and the court said:

"* * * We do not find that, at any stage of the proceedings before the Board, the objection now urged as to the Board's lack of power was presented to it or to any member or agent of the Board, or that there are any 'extraordinary circumstances' which would excuse such failure.

\* \* \* \* \* \*

"For the reason that the record does not show compliance with Section 10(e) with respect to the question raised as to the Board's authority, the decree is

Affirmed."

Pursuant to statutory authority granted to it the National Labor Relations Board promulgated rules and regulations, Section 102.46, 29 U.S.C.A. § 102.46 (1953), which provide in part as follows:

Sec. 102.46 "(a) * * * any party may file with the Board * *

exceptions to the intermediate report and recommended order or to any other part of the record or proceedings * * *.

"(b) No matter not included in a statement of exceptions may thereafter be urged before the Board, or in any further proceedings. * * "

As to the admitted non-compliance with section 9(h) of the act by the Eau Claire Industrial Union Council, the following provisions of sections 9 and 10, 61 Stat. 136, 146, 29 U.S.C.A. §§ 159, 160, are controlling:

Sec. 159.

" * * * (h) * * * no complaint shall be issued pursuant to a charge made by a labor organization under subsection (b) of section 160 of this title, unless there is on file with the Board an affidavit executed contemporaneously or within the preceding twelve-month period by each officer of such labor organization and the officers of any national or international labor organization of which it is an affiliate or constituent unit that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods."

Sec. 160.

" * * * (b) Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, * * * ".

There is nothing in the record before this court to indicate that the complaint herein was issued pursuant to any charge made by the Eau Claire Industrial Union Council to the Board. It affirmatively appears that the charge which originated this proceeding was made by the United Paperworkers of America, C.I.O. In view of that fact compliance with section 9(h) of the act by the Council was not required.

Accordingly, the motion made in this court by the respondent for an order directing the taking of testimony by the Board, as to compliance with section 9(h) of the National Labor Relations act, is denied.

2. Respondent commenced the manufacture of calendars in Eau Claire, Wisconsin, in the spring of 1950. For many years prior to that time it had been operating a similar business in Minneapolis, Minnesota. There is no evidence in the record that prior to the controversy involved in this case, respondent had ever been involved in any labor union difficulties. Practically all of its employees in the Eau Claire plant were local people. When they were employed, letters such as one dated March 13, 1950, introduced into evidence by the Board's counsel, were written to the new employees by respondent. This letter proudly referred to the physical working conditions in the new Eau Claire plant. It explained its plan for life and accident insurance for its employees, as well as hospital benefits for employees and their dependents, and expressed the hope for a happy association with its employees. Respondent's operations are seasonal, and entail a severe reduction in employment each December, followed by re-employment early in the following year, which is increased as orders are received until full production is re-established.

Prior to the fall of 1950, there existed in the plant a committee of employees, which was a social organization started with an advance of $150 by respondent. Thereafter, respondent turned over to the committee all profits from the operation of a plant canteen, where soft drinks, etc., were sold to employees in the plant.

On October 19, 1950, United Paperworkers of America, C.I.O., opened an organizational drive among respondent's

employees, by distributing handbills to the employees as they left the plant, inviting them to attend a Union meeting on October 24. At that first meeting, attended by about 60 of respondent's approximately 140 employees, 47 signed membership application cards. Similar bills were distributed on October 30 and November 2, announcing a Union meeting for the evening of November 2. On two of these occasions a foreman or a supervisor from respondent's plant requested the handbillers to stop distribution and leave the premises. One witness testified that A. O. Bast, the plant manager, told employees that he had "fought the [C.I.O.] before and would again, even if he had to close up the plant and leave town". After the November 2 meeting the Union notified respondent by letter that the employees had designated it as their bargaining representative and requested bargaining conferences. The Union on the following day filed a petition with the Board requesting that it be certified as exclusive representative of respondent's employees. While the Board had statutory authority to hold an election by secret ballot among respondent's employees to ascertain who were to be the representatives of the employees, the record fails to show that such a ballot was ever ordered by the Board or taken.

James Gabriel was an employee of respondent, claimed by the Board to be a supervisory employee, but it is contended by respondent merely that he was a "lock-up" man in the press department who had previously been a member of the C.I.O. while working in some other establishment. Gabriel started a movement to form an independent organization among respondent's employees. He asked Melvin Anderson, who was president of the previously organized social group, to call that group together during a work "break" on October 26, when Gabriel spoke in favor of an independent organization. A committee of employees was formed, representing all the so-called departments of the plant. The committee obtained authorization petitions calling a general meeting of the employees for the evening of November 2. The petitions were signed by a substantial majority and they were presented to management, which recognized the group as a bargaining agent. At its first meeting the activities of the committee were limited to 30 days, which was later extended by a vote of the employees. This committee prepared several drafts of a labor contract, which it submitted to a general meeting of the employees. The draft was changed from time to time, but it was finally accepted by the group, and with a slight modification was accepted by respondent. The October 26 meeting exceeded the 10-minute break period and ran about 30 minutes. Respondent did not deduct this time from the employees' wages. The employees' committee met with management on November 1. Upon being asked by the employees' committee who could give it advice as to the procedures of organization, the respondent's president suggested Mr. Ocken, who was general manager of Graphic Arts Industry, an organization serving the printing craft trade in six states, who had over a period of years, negotiated contracts for affiliated unions, for independents, and for employers, and had served as arbitrator representing affiliated unions, independent unions, employers and as a neutral arbitrator. He put Gabriel in touch with Ocken.

The November 2 affair was a dinner meeting to which all employees were invited. It was planned by the employees' committee, although there is evidence that Mr. Bast suggested the banquet with free food. It was paid for out of funds belonging to the social organization, which came from the operation of the canteen. The canteen was operated with the assistance of the respondent through the furnishing of free space, light and heat, and equipment, and the assignment of two regular employees to canteen duty for two hours a day.

The employees' committee was recognized as bargaining agent a few days thereafter. On November 1, Bast had

all machinery in the plant stopped for five minutes before the end of the shift so that an announcement could be made about the banquet. On November 2, during working hours, Gabriel and other employees circulated lists through the plant to determine who would attend the banquet.

Ocken attended the banquet and furnished forms on which signers could designate a group of nine employees as their official representatives to negotiate a contract with respondent. After hearing Gabriel and Ocken speak in favor of unaffiliated labor organizations, a substantial number signed the designated form. The following day the committee began circulating similar lists among employees who had not attended the banquet and in a few days had obtained approximately 90 signatures. On November 6, Ocken prepared a letter from the committee to respondent asking for recognition of the independent union, which was acknowledged by respondent, following which negotiations for the contract proceeded. The contract, effective to December 31, 1952, was executed on November 21, 1950. On November 28, after the expiration of the thirty-day period, the committee was authorized to continue acting indefinitely by vote of 47 to 44. In early December, under the guidance of counsel, whom Ocken had recommended at Gabriel's request, the committee adopted a constitution and by-laws and became formally designated as the Shedd-Brown Plant Association, which respondent continued to recognize as the representative of its employees. Respondent subsequently turned over to it an accumulated fund of $400, being the original donation of $150 and money from the operations of the plant canteen, which thereafter continued to function.

On January 3, 1951, a resolution was passed by the Association membership that a rider be inserted on its contract with respondent making membership in that Association a condition of employment and that all persons affected were to fill out application blanks and dues deduction blanks within thirty days from that date or thirty days after commencing work. Gabriel posted a copy of the resolution on the plant's bulletin board. The record fails to show that respondent agreed to such incorporation in the contract, but it does appear that from that time forward it deducted fifty cents a month from the wages of all but approximately 15 employees and gave this money to the Association.

As to the activities of the plant Association during the year 1951 and subsequently, it appears that Gabriel left the employ of respondent on April 6, 1951, and he was replaced as president of the Association on May 7, 1951, by Earl Balow, who was a witness called originally by the general counsel of the Board. Prior to that date Balow had never been on the committee or held any office with the Association. He was still serving as president and as chairman of the grievance committee when he testified on December 11, 1951. When Balow came into office there was an attorney named O'Brien representing the Association. Balow advised Mr. O'Brien by letter that the Association did not need any legal consultant, and, if it was felt otherwise, it preferred a local attorney. At the hearing before the examiner the Association was represented by attorney Herrick of Eau Claire, Wisconsin.

During the summer and fall of 1951, the Association (sometimes called the committee) handled and adjusted with respondent about a dozen grievances of employees, and there were on two occasions grievances resulting in work stoppages. The grievances related to wages, working conditions, vacation schedules and the discharge or layoff of one employee. Mencill Anderson, who was a member of the committee, stated that he could not recall any directions or orders given to him by anyone connected with management as to how the committee should operate. There is no direct evidence that the respondent in any way influenced or dominated the Association after the fall of 1951, or that it was exerting any influence upon the Association at the time of the entry of the

Board's order on January 28, 1953, in which it was found that, by sponsoring and supporting the Association, both financially, and by an assertion of its control over its employees' jobs, respondent interfered in the formation of, supported and dominated the Association in violation of section 8(a)(2) of the act. The Board's order requires respondent to cease and desist from dominating and interfering with the formation and administration of, and contributing support to, the Association or any other labor organization of its employees; from giving effect to any contracts with that Association; and the order requires respondent to withdraw recognition from, and disestablish the Association as bargaining representative of its employees; and to reimburse its employees for any Association dues deducted from their earnings.

Respondent's counsel admits that contributions from the canteen fund to the independent union should be ordered discontinued and says that, in fact, they have been discontinued.

We believe that the Board's conclusion, that respondent interfered in the formation of, and supported and dominated the Association, is based upon substantial evidence in the record considered as a whole, and the cease and desist order in that respect will be enforced. However, respondent contends that it is unnecessary and unfair to require that the Association disband. This presents a question which is not of first impression. Despite the fact that during and subsequent to the year 1951 facts showing active domination of the Association by respondent do not appear in the record and it affirmatively appears that its activities then were apparently in the interest of the employees, we are unable to say that these latter activities of the Association erased the effects of the respondent's earlier influence and domination.

In N. L. R. B. v. Link-Belt Co., 311 U. S. 584, at page 600, 61 S.Ct. 358, 85 L.Ed. 368 at page 366, the court said:

" * * * It is urged that the subsequent conduct of Independent demonstrates its independence and that an order directing the employer to cease and desist all interference with the employees and with Independent is wholly adequate for the evil at hand. The Board, however, was not forced to conclude that the subsequent activities of Independent erased the effects of the employer's earlier discrimination, any more than it was compelled to believe that the employer's later show of impartiality obliterated the consequences of its prior interference with the employees' freedom of choice. We cannot assume that the employees will be free from improper restraints and will have the complete freedom of choice which the Act contemplates where the effect of the unfair labor practice is not completely dissipated. The Board not the courts determines under this statutory scheme how the effect of unfair labor practices may be expunged."

To the same effect is N. L. R. B. v. Southern Bell Tel. & Tel. Co., 319 U.S. 50, 63 S.Ct. 905, 87 L.Ed. 1250; and N. L. R. B. v. Falk Corp., 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396.

The order of disestablishment must be enforced, provided, however, that respondent shall not be required to vary the wages, hours, or other substantive features which respondent established in the performance of contract with the Association dated November 21, 1950, or any extension, renewal, modification or supplement thereof or any superseding contract or agreement.

3. As to the Board's order that respondent reimburse its employees for any Association dues deducted from their earnings, certain facts should be noted: despite the request by resolution of the Association that membership therein should be a condition precedent to the hiring of any employees in the plant, respondent did not acquiesce in that sug-

gestion and the contract between it and the Association was never amended to so provide; at the time the order of the Board was entered there were actually several employees in the plant who were not members of the Association. This was not a closed shop. Some employees chose not to belong to the Association and there was no checkoff of Association dues from their wages. Respondent's employees, due to its unfair labor practices, found but one labor organization to which they could belong. However, they could work in the plant without belonging to that organization, as some of them did. Having that choice, which included a choice not to have part of their salary deducted by respondent to be paid as dues to the Association to which they were not compelled to belong, it follows that the checkoff of Union dues was made only with the free consent of those affected. The Board relies upon Virginia Electric & Power Co. v. N. L. R. B., 319 U.S. 533, 63 S.Ct. 1214, 87 L. Ed. 1568. However, that case involved a closed shop, which means that in that case the consent by employees to a check-off was coerced by the implicit threat of loss of job if the consent was not given. We refuse to grant the enforcement of this part of the Board's order.

Under similar circumstances the Board has heretofore denied reimbursement, at the same time calling attention to Virginia Electric and Power Co. v. N. L. R. B. supra. In re: Remington Arms Company, Inc. and United Electrical and Radio Machine Workers, C.I.O., 62 N.L.R.B. 611, 614.

4. In its order the Board concluded that the reasons which motivated respondent to discharge employees Anderson and Thom were the activities of these employees in support of the Union and, accordingly, respondent was found to have violated section 8(a)(3) of the act, 29 U.S.C.A. § 158.

Mrs. Anderson was very active in the Union's organizing campaign and in opposing the Association. She was on the Union's organizing committee and solicited Union membership at the plant. She was generally referred to as "President of the C.I.O."

From her own testimony the following facts appear: In September or early October, 1950, all the girl employees in the plant, including Mrs. Anderson, were called into Mr. Bast's office, because there had been some dissension due to the fact that Anita Thom had been taken out of the bindery department and put into the press department where she got a higher rate of pay. Bast said that Anita was a good worker and strong and built for the job. When Anita Thom developed some trouble with her arm Bast told Mrs. Anderson to send her home for two days and she said to Bast that she thought Anita was perfectly able to do the job that she was doing and that she didn't think it was necessary for her to go home.

When Mrs. Anderson was employed she was married but living separately from her husband, although her employment card showed that she was single and divorced. She went to work March 6, 1950, as a nurse's aid and she was assigned to do some work in the canteen and the bindery department, in addition to the nursing job. While thus employed she stated that she had heard somebody say that Bast and one Betty Levin were "out together". Upon such information reaching Bast, Mrs. Anderson was called into his office and there, in the presence of Bast, Miss Levin and Miss Drace of the office force, Bast asked who made the statement and Mrs. Anderson said that she had not made it, and "if she had known who made it, she wouldn't tell him."

Mrs. Anderson did not come to work on November 7, 1950, and her husband notified Mr. Sowler, foreman in the shipping department, of that fact. She had no connection with the shipping department. She did not come to work on November 8, upon which occasion she notified Mr. Sowler herself by telephone. She did not call the office "because she considered him part of the office". On November 9, about 7 o'clock, she came back to work and talked to Miss Drace,

because the rules required her to do so. The rules were posted on the board. They provided that one who was not able to come to work should report to the office. On November 9, Miss Drace said, "I should have called the office, not the foreman". Mr. Edgar, the plant superintendent, then "talked with me about medical supplies including a bottle of alcohol that had been found somewhere around the plant and he told me that the matter of those medical supplies was my responsibility." The bottle was about half full of alcohol. Later that day Edgar told her that she would be relieved of her duties as nurse's aid the following Monday, but that she could work in the bindery. Thereupon, she did not come to work the next day, November 10, and she did not notify anybody. That was Friday. Saturday was not a working day for her. Her husband called the plant on Monday. She did not. On Monday, when he called, "they told him that I was through". She did not communicate with the plant on Tuesday, but she did go there on Wednesday and talk to Edgar and he confirmed the information her husband got on the phone on Monday, that she was through.

Mrs. Thom starting in June, 1950, worked first in the bindery department and later in the job-press department. Her work had been commended by supervisors on several occasions and she was selected over other employees with more seniority for two wage increases within her first four months of employment.

She served on the Union's organizing committee and was one of its earliest and most active adherents. She signed an application card at the October 24 meeting and passed out such cards to employees at the plant.

The day after said meeting Mr. Bast instructed Mrs. Anderson, the nurse, to send Mrs. Thom home for a couple of days to rest her arm which she had strained three weeks earlier. Mrs. Thom protested the layoff and, as above pointed out, Mrs. Anderson advised Bast that Mrs. Thom was able to continue her work without difficulty. However, Gabriel told another employee that Mrs. Thom "was in strong with the CIO," and he therefore intended to "arrange it so that she wouldn't be at work when we had the meeting", evidently referring to the Association banquet on November 2. Mrs. Thom attended the Union meeting that night instead of the banquet and the next morning refused Gabriel's request that she sign a card authorizing the Association to represent her, telling him that she had signed up with the Union and intended to stay there. On November 16, when she again refused, Gabriel told her, "You'd better, or you'll never get your name on the seniority list". The following day, while she was making two calls from a phone in the shipping department, Gabriel listened in on an extension phone and shortly thereafter he told several employees that she had called the Union's office to inform them that the Association was having a meeting the following Monday, "that he had just been waiting to get some dirt on her, she was a CIO spy there" and that something should be done about it. On the same day he spoke to Mr. Bast in the plant and immediately afterwards told another employee that Mrs. Thom was going to be laid off. A few minutes later she was told to report to Mr. Bast, who told her that her employment would terminate at 4:30 P. M. that day, giving as a reason that all she did was "talk, talk, talk" and that none of the bosses wanted her in his department.

■ The burden was upon the Board to show by substantial evidence on the record considered as a whole that Anderson and Thom were discharged because of their activities in support of the Union.

■■ As to Mrs. Anderson, this burden was not sustained. She was guilty of violating company rules with which she was familiar and was an untractable person in the plant. If many employees had stayed away from work without promptly and properly notifying the respondent, as she did, work would have been seriously disrupted. Although as a witness she

had stated that she had heard something evidently supposed to be derogatory about her superior, Mr. Bast, and one Betty Levin, when Bast asked her about it she denied that she had made the statement. Although it was no real concern of hers, Anderson took issue with Mr. Bast when Mrs. Thom having developed some trouble with her arm, Bast told her to send Mrs. Thom home for two days. From her own testimony it thus appears that Mrs. Anderson was a recalcitrant employee and a disturbing element in the plant. The most that can be said in support of the Board's conclusion as to her is that with these reasons present justifying her discharge, as well as her Union activities, which would not justify her discharge, which was the real cause is a matter of speculation or conjecture. The Board's conclusion cannot be sustained where it finds only such support in the record. National Labor Relations Board v. Thomas Rigging Co. 9 Cir., 211 F.2d 153, at page 158 the court said:

> "We do not lose sight of the fact that we should not substitute our judgment for that of the Board as to the credibility of witnesses or reasonable inferences drawn from the testimony, but we are functioning within our proper sphere when we say that mere speculation is not sufficient to uphold a finding of an unfair labor practice."

On the record as a whole the finding and the order of the Board as to Anderson are not supported by substantial evidence. And this court cannot grant enforcement of such order.

As to Mrs. Thom, the Board has shown by substantial evidence on the record considered as a whole that she was discharged because of her activities in support of the Union and, to that extent, the order requiring that respondent offer her reinstatement to her former or a substantially equivalent position, without prejudice to seniority or other rights and privileges, and make her whole in the manner set forth in the section of the intermediate report entitled "The remedy", will be enforced.

■ 5. The Board found that employees, Amundsen, Blakely, Crandell, Kelly, Kosmo, Kramer, McMahon, Nimsger, Olson, Woodford, Posz, Radle, Ross, and Welter were not rehired because of their C.I.O. affiliation and activities and because they refused to join or support the Association. It therefore ordered respondent to offer these employees full reinstatement to their former or substantially equivalent positions and to pay them a sum of money equal to that amount which they normally would have earned as wages during the period from the time of respondent's discrimination to the date of offer of reinstatement, less their net earnings during said period.

Respondent contends that this finding and order are not supported by substantial evidence and that, in fact, the record affirmatively shows that the allegedly discriminatory conduct was motivated, not by anti-union considerations, but by other legitimate business reasons.

There is substantial evidence to support this finding of the Board with respect to all these employees except Betty Welter, and with this exception the order of reinstatement must be enforced.

As to Betty Welter, the only evidence regarding the failure to rehire her was the company's records which showed:

> "Recalled for work May 22, 1951. No one answers the phone, tried several times during the week, never received an answer to the telephone. We understand that she is working at Pressure Cooker."

Since this evidence indicates that respondent attempted to rehire her, it cannot logically be said that respondent discriminated against her in failing to rehire her.

As to the other 13 employees, the record contains ample evidence to support the Board's finding that they were not rehired because of their C.I.O. affiliation. This was a violation of Section 8(a)(1) and (3) of the act. Since it affirmatively

appears that at the time of the 1950 layoff these 13 employees were in effect told by respondent that they would be considered and recalled for work without further application on their part when jobs became available, a showing that they later made specific applications for reemployment was unnecessary.

The entire background of respondent's antagonism toward the Union, its sponsorship and domination of the Association, and the disproportion between the number of Union and Association members rehired, all tend to support the Board's finding that respondent pursued a rehiring policy aimed at keeping out the most avid Union supporters.

█ Although percentage evidence, standing alone, will not support an action such as this, "the disproportionate treatment of union and nonunion workers may be very persuasive evidence of discrimination, * * * and may create an inference of discrimination leaving it to an employer to give an adequate explanation of the discharge or lay-off, * * * and when there is evidence tending to prove that the employer has openly expressed his hostility to union members, specifically warning them that he has ways of getting rid of a union man, and there is no evidence negativing the inference of discrimination, we can not say that the inference thus created has been destroyed." N. L. R. B. v. Chicago Steel Foundry Co., 7 Cir., 142 F.2d 306, 308.

Of the 20 employees recalled in January and February of 1951, only one was a Union member, 19 were Association members. Every one of the 7 female members of the C.I.O. organization committee was either discharged or not recalled after the December 1950 layoffs. In contrast, every one of the 5 available female members of the Association committee who remained on that committee during and after December 1950 was rehired in 1951. An undenied statement attributed to Gabriel further evidences an intent to discriminate. Lefstad testified that some time in December when the layoffs were taking place, Association adherents noticed that "some of the girls that had been laid off since the banquet were pretty strong for this independent Union and they figured they should be kept on * * * rather than some of the girls that hadn't joined the organization." When this protest was made to Gabriel, he replied that he had just been in the office while Bast was talking to Ocken on the telephone; that during that conversion Gabriel asked to speak to Ocken and told him that some of their "strong supporters" were being laid off; that Ocken asked to talk to Bast again so that he could "set him right, * * * that the (Association) members should be kept on and those that hadn't joined the organization should be the first laid off."

All of the above facts, together with manager Bast's earlier expressions of hostility toward the C.I.O., are sufficient to support the Board's finding of discrimination.

Respondent defends, however, on the ground that it had no knowledge of the C.I.O. membership or activities of these 13 employees. In viewing the record, we believe a preponderance of the evidence establishes that respondent did have such knowledge. Crandell, Posz, McMahon, Welter and Radle were appointed to the C.I.O. organization committee in the presence of Gabriel, who attended the C.I.O. meeting of October 24, and all of them were thereafter active in the solicitation of membership in the plant. Even if direct evidence of the respondent's knowledge of the C.I.O. membership of these employees were lacking, such knowledge could be inferred from its admittedly close contact with its employees and its knowledge of the Association membership which it gained by a list received from the Committee. N. L. R. B. v. Link-Belt, supra.

█ Respondent also argues that the alleged discrimination is disproved by the fact that during 1951, 29 members of the C.I.O. were offered re-employment. There is no merit to this contention. An

employer's rehiring of laid-off employees does not have to be uniform as to all such employees in order to constitute discrimination. N. L. R. B. v. Nabors Co., 5 Cir., 196 F.2d 272. It was not necessary to fail to recall every C.I.O. adherent in order to discourage C.I.O. activities. Such discouragement may be effected by making "an example" of some of them. N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 602, 61 S.Ct. 358, 85 L.Ed. 368.

█ Finally, respondent most strongly contends that it had legitimate cause for not rehiring these 13 employees, i. e., that they were not satisfactory workers. The reasons stated were such as "laid down on the job", "slow worker", "troublemaker", "talks a lot", and similar statements. The burden of giving an adequate explanation for failure to rehire was imposed upon respondent by all the other evidence which gave rise to an inference of discrimination. N. L. R. B. v. Remington Rand, 2 Cir., 94 F.2d 862. We cannot say that the Board was unjustified in concluding that respondent did not meet that burden. It appears that, although the testimony was conflicting as to the reasons for failure to rehire, the Board may have reasonably doubted the soundness of respondent's evidence on this, and there was substantial evidence on the record as a whole to support the finding that respondent's action was motivated by anti-union bias.

█ The credibility of witnesses and the inferences to be drawn from the evidence, are matters for the Board, not the courts, to determine. N. L. R. B. v. Wiltse, 6 Cir., 188 F.2d 917.

This court will enforce the Board's order for reinstatement of the 13 employees and for making whole said employees for any loss of pay suffered by them through respondent's discrimination, as aforesaid, to be determined by the Board in supplementary proceedings, and this court directs that the exact computations shall be made in accordance with law.

In accordance with the views herein expressed the order of the Board entered January 28, 1953, as clarified by its supplemental decision and order of March 23, 1953, is modified, and as thus modified, will be enforced by this court.

Modified, and as thus modified, enforced.