**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**COMFORT, INC., Respondent.**

**No. 18210.**

United States Court of Appeals Eighth Circuit.

Sept. 13, 1966.

Rehearing Denied Oct. 11, 1966.

4. 42 U.S.C.A. § 416(i) (2) (F).

Richard S. Rodin, Atty., National Labor Relations Board, Washington, D. C., for petitioner. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and George B. Driesen, Atty., National Labor Relations Board, Washington D. C., were with him on the brief.

Bailey C. Webber, Ottumwa, Iowa, for respondent.

Before VOGEL, Chief Judge, and MATTHES and MEHAFFY, Circuit Judges.

MATTHES, Circuit Judge.

This case is before the court on the petition of the National Labor Relations Board pursuant to § 10(e) of the National Labor Relations Act, as amended, 29 U.S.C.A. §§ 151–168 (1959), for enforcement of the Board's order issued on June 2, 1965. The Board's decision and order are reported at 152 N.L.R.B. No. 106. No jurisdictional issue is presented. We modify the order as hereinafter set out and grant the enforcement of it as so modified.

The Respondent, an Iowa corporation, is engaged in the manufacture and sale of reclining chairs at Ottumwa, Iowa. In the latter part of September, 1963 [1] it had approximately seventy production and maintenance employees. At that

---

1. All dates are 1963 unless otherwise indicated.

time Respondent's official and managing personnel were: Robert Last, Secretary-Treasurer and plant manager; Clair Burkhiser, a Vice-President active in plant management and operations; Ross Pannell, Superintendent; Wayne Netzley and Robert Bennett, Foremen; Lena Ream, Forelady; Virgil Corzette and Jerry Rankin, Supervisors.

The starting point for the unfair labor practice charges is the organizational efforts of the International Association of Machinists, District Lodge 105, AFL–CIO, hereafter referred to as Union. The complaint filed by the Board charged that Respondent had committed unfair labor practices within the meaning of § 8 (a) (1), (3) and (5) of the Act. In brief, the Board found that Respondent had engaged in surveillance and spying activities, had resorted to proscribed interrogation of its employees, and had otherwise interfered with, restrained, and coerced its employees in violation of § 8(a) (1) of the Act. The Board found further that by discharging employees Donald Coltrain, James Benedict and Floyd Palmer and by terminating the employment of its striking employees, Respondent had violated § 8(a) (3) and (1) of the Act, and that Respondent had violated § 8(a) (5) and (1) of the Act by refusing to recognize and bargain in good faith with the Union.

### SECTION 8(a) (1)—SPYING AND SURVEILLANCE.

The campaign to organize Respondent's production and maintenance employees was commenced on September 23, 1963. On September 30th the Union filed a representation petition with the Board and a copy thereof was apparently received by Respondent on October 2nd. On the evening of October 3rd, a number of employees held a union meeting in the union hall in Ottumwa, Iowa. Burkhiser was seen in the vicinity of the hall between three and six p. m. that day by a number of Respondent's employees. He readily admitted that he was near the place of the meeting but unequivocally denied that he engaged in surveillance or was motivated by a desire to intimidate

or frustrate the employees in their organizational efforts. He claimed that he had left Respondent's plant in order to attend to banking and other business, have his automobile serviced, and make plans for a hunting trip.

That the trial examiner took a dim view of Burkhiser's explanation is manifested by his report, wherein he stated in part:

"Burkhiser's story, in short, is that he, a busy plant executive who normally stayed close to the plant during working hours, or hurried back to it if he had to go downtown, merely happened to choose the day of a union meeting to spend 3 hours loitering near the union hall, waiting for a bank to open and hoping to encounter a friend to plan a hunting trip for 3 weeks later. Perhaps the story is not incredible on its face. But its falsity is revealed by the testimony of Foreman Bennett, a witness called by the Company, who testified that on the day following the meeting in question he told Burkhiser that some of the employees at the meeting the preceding day had seen Burkhiser there, to which Burkhiser replied that he had been there, had seen employee Stevens go in and had also seen employee Palmer there. * * *

"On this state of the record, I find that Burkhiser spied on the union hall on the occasion in question, and in the light of his sworn testimony on this matter, read in the light of the entire record, I find him totally unworthy of belief and to be credited only where his testimony is corroborated by other, more reliable witnesses. The espionage, of course, plainly violated Section 8(a) (1) of the Act."

Mindful of the admonition of the Supreme Court in Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 490–491, 71 S.Ct. 456, 95 L.Ed. 456 (1951), that we, as the reviewing court, are not to abdicate the conventional judicial function, and that it is our responsibility for assuring that the Board keeps within reasonable grounds, we have inde-

pendently studied all of the evidence and pondered all facets of the incident. Burkhiser's explanation does have a ring of plausibility. His presence near the place where the employees were congregating could have been solely for legitimate personal or business reasons. Of course, a fact question was presented and it is plain that the trier of the facts did not choose to credit Burkhiser's testimony. The question of credibility is primarily a matter for Board determination. N. L. R. B. v. Morrison Cafeteria Co. of Little Rock, Inc., 311 F.2d 534, 538 (8th Cir. 1963); N. L. R. B. v. Byrds Manufacturing Corporation, 324 F.2d 329, 332 (8th Cir. 1963). In light of all of the circumstances the Board was not compelled to believe Burkhiser and disregard the adverse circumstantial evidence. Consequently, we conclude that the Board's finding that Burkhiser was engaged in spying and surveillance, and that such conduct was violative of § 8(a) (1) of the Act, is supported by substantial evidence. For cases holding that surveillance is an unfair labor practice, see and compare Edward Fields, Inc. v. N. L. R. B., 325 F.2d 754, 758–759 (2d Cir. 1963); Hendrix Manufacturing Company v. N. L. R. B., 321 F.2d 100, 104 n. 7 (5th Cir. 1963); N. L. R. B. v. Bonham Cotton Mills, Inc., 289 F.2d 903, 904 (5th Cir. 1961); Jackson Tile Manufacturing Company v. N. L. R. B., 272 F.2d 181 (5th Cir. 1959).

### SECTION 8(a) (3)—DISCHARGES OF COLTRAIN, BENEDICT, PALMER.

 The applicable legal principles are not in dispute. An employer who discriminates among employees does not violate § 8(a) (3) unless the discrimination is based upon union membership or other union connected activities. Thus the employer may discharge an employee with impunity if the discharge is not motivated by the employee's union activity. N. L. R. B. v. Ace Comb Company, 342 F.

2d 841, 847 (8th Cir. 1965); N. L. R. B. v. South Rambler Company, 324 F.2d 447, 449 (8th Cir. 1963); see also Steel Industries, Incorporated v. N. L. R. B., 325 F.2d 173, 176 (7th Cir. 1963), holding that "an employer has the right to discharge an employee for good reason, bad reason or no reason, absent discrimination." An employer's general hostility to unions does not in and of itself supply an unlawful motivation for a specific discharge. Fort Smith Broadcasting Company v. N. L. R. B., 341 F.2d 874, 878 (8th Cir. 1965); N. L. R. B. v. South Rambler Company, supra. The inference that an employee was discharged because of his union activity must be based upon evidence, direct or circumstantial, not upon mere surmise or speculation. N. L. R. B. v. South Rambler Company, supra; Osceola County Co-op. Creamery Ass'n v. N. L. R. B., 251 F.2d 62, 69 (8th Cir. 1958). The burden of proving an improper motivation for discharge is upon the Board. N. L. R. B. v. South Rambler Company, supra.

 Coltrain was discharged on October 2nd. The Board found that he had been discharged because of his leadership in the union drive. Respondent contends that Coltrain was discharged for cause and that there is no substantial evidence in the record as a whole to support the Board's finding. We agree with Respondent and deny enforcement of that part of the Board's order relating to Coltrain.

It is, of course, true that Coltrain was a leader in the union drive but others were just as active in the organizational campaign. William E. Muchow and Ronald Wynn also solicited and obtained cards from other employees. They were not outrightly discharged.[2] Respondent argues that the two officials, Superintendent Pannell and Foreman Netzley, who effectuated the discharge, had no knowledge of Coltrain's prior union activity. Both of them testified unequivocally to that effect. The evidence tending

---

2. Respondent's records indicated, however, that Muchow was among the forty-one striking employees replaced on November

5, 1963; Wynn, on the other hand, voluntarily quit on November 4th to take other work.

to establish Respondent's knowledge of Coltrain's prior interest in the Union is somewhat meager. Supervisor Rankin knew of the card solicitation campaign but, according to his testimony, did not impart the information to either Pannell or Netzley. The Board found, however, that Rankin's knowledge constituted knowledge to Respondent. Even though we accept that premise, the evidence as a whole is insufficient to establish that Coltrain's union activities were the underlying reason for his discharge.

It was shown beyond dispute that Coltrain's workmanship had been of an inferior quality and had been the subject of criticism by his superiors for some time prior to his termination. The fact of the matter is that Coltrain had been previously discharged because of his inferior work performance. When he was reemployed he was informed that he was being placed on probation. A fair analysis of the evidence shows that despite repeated warnings, Coltrain's substandard workmanship continued. On the day of Coltrain's termination, a large number of chairs had to be rejected because of his faulty performance, and at that time he was given a written "notice of termination of employment," which recited that his "work not up to our standards." Coltrain voluntarily and with full knowledge of its contents signed the termination notice and departed.

In summary, the Board's finding is not supported by substantial evidence. To the contrary, this record convincingly demonstrates that Coltrain's persistent failure to measure up to the requirements of Respondent foredoomed his discharge. The record does not show that he was fired because of any union activity; cf. *Osceola County Co-op. Creamery Ass'n v. N. L. R. B.*, supra; *Fort Smith Broadcasting Company v. N. L. R. B.*, supra; *N. L. R. B. v. Ace Comb Company*, supra.

 Employee Benedict was hired on October 3rd and discharged on October 16th. Respondent defended the discharge on the ground that Benedict was an incompetent employee and that he had been fired for cause. He was one of forty-two employees who wore a union button in the plant on October 4th. There is no evidence to show that Benedict otherwise manifested an interest in the union. The examiner, after reviewing all of the circumstances, concluded that the General Counsel had failed to discharge his burden of proving that Respondent had discriminated against Benedict, and recommended dismissal of the complaint. The Board disagreed and found that he was discharged because of his union activities. We believe the examiner was right and consequently refuse to order enforcement of the Board's order relating to Benedict.

The Board was evidently impressed by the circumstances attending the discharge. Pannell and Netzley made the decision to discharge on the morning of October 16th but did not effectuate that decision until that afternoon. Assuming *arguendo* that this circumstance did not comport with the Board's concept of fair play, the irresistible fact is that there is no evidence to support the conclusion that Benedict was discharged because of any union activity. His only demonstrated interest in the union was the wearing of a union button. See *N. L. R. B. v. South Rambler Company*, supra, where, in denying enforcement of the Board's order, we pointed out that the extent of the discharged employee's union activity consisted merely of his signing of a union authorization card. Logic dictates that if respondent fired Benedict for his manifestation of his union sympathy, it would not have tolerated his incompetence on three different jobs for a period of two weeks after he was seen wearing a button on October 4th. Beyond question, the inference drawn by the Board was not based upon probative evidence, but upon mere speculation and suspicion.

Palmer, who was active in the Union's organization campaign, circulating union cards and displaying a union button on October 4th was discharged on October 30th on the ground of "chronic absenteeism." Palmer had previously received

three warning slips for his unexcused chronic absenteeism.

The examiner found there had been a "failure of proof as to Palmer" and recommended dismissal of the complaint against him. Again the Board disagreed and found that " * * * the record supported a conclusion that employee Palmer was discharged because of his union activities," and that "the circumstances clearly show, in our opinion, that Respondent associated Palmer with the strike on October 30th and that it discharged this leading union adherent for union considerations, thereby violating Section 8(a) (3) and (1) of the Act."

The record firmly supports the examiner's finding that Palmer had been guilty of unexcused absences on October 10th, 16th and 17th. He reported to work on the 17th with a "hangover," was unable to perform his duties, and was sent home. Respondent, however, did not discharge him for that infraction of the rules. Instead, supervisor Bennett instructed Palmer to report for work the next morning. Palmer complied and was on the job every day thereafter until October 30th, except on two occasions, when he was ill and furnished a doctor's certificate so attesting.

There is also evidence to support the Board's finding that Bennett suggested to another employee that he "ought to stuff it [union button] down his [Palmer's] neck." This was followed by a suggestion that the employee pick a fight with Palmer to provide a pretext for his discharge.

On October 30th approximately forty-two employees, including Palmer, failed to report for work. This was the beginning of the strike hereinafter discussed. Palmer's absence prompted Respondent to issue the notice of his termination. The examiner was influenced by the failure of the General Counsel to produce Palmer as a witness at the hearing, or to otherwise establish whether he was ab-

sent on October 30th because of the strike or for some other reason.[3] We do not view with favor the failure of the General Counsel to produce Palmer as a witness, or his failure to establish by competent evidence why Palmer did not report for work on October 30th. But this omission is not decisive of the question before us, for the Respondent, although fully aware that a substantial number of its employees remained away from their jobs, made no effort to determine whether Palmer was one of the striking employees or excusably absent. Instead it summarily fired him.

We deem further discussion on this point unnecessary. We hold that the Board's finding that in discharging Palmer, Respondent violated § 8(a) (3) of the Act is supported by substantial evidence, and we grant enforcement of the order. Inasmuch as Palmer is in the same category as the other strikers who were "discharged," as hereinafter shown, the remedy applicable to such strikers should also be applicable to Palmer.

### SECTION 8(a) (1), 8(a) (3)—DISCHARGE OF STRIKING EMPLOYEES.

Approximately forty-two employees went out on strike on October 30, 1963. The Board found that they were unlawfully discharged by Respondent on November 5th in violation of § 8(a) (3), and that prior to November 5th Respondent had threatened to discharge the striking employees in violation of § 8(a) (1) of the Act.

One of the issues before the Board and also presented here is whether the strike was an "unfair labor practice strike" from its inception. Respondent contends it was initiated as an economic strike and continued as such. Frank DeGeus, an employee, was discharged on October 29th. His discharge became the subject of an unfair labor practice charge against Respondent. The Board found, however, on the recommendation of the

---

3. Palmer did appear on the picket line a day or two after the strike's inception on October 30th, and it seems to be a legit- imate inference that he failed to report on the 30th because of the strike.

examiner, that the dismissal of DeGeus was motivated by lawful cause and not prompted by any union affiliation or activity. Although the Board found that the discharge of DeGeus, "which was not an unfair labor practice," was the immediate cause of the strike, it further concluded that prior unfair labor practices "played a contributory role in bringing about the decision to strike" and that "the strike was therefore an 'unfair labor practice strike' so that the strikers enjoyed statutory protection against replacement as well as against discharge."

We affirm the Board's findings. While the discharge of DeGeus triggered the strike, the record attests to general discontent on the part of the striking employees over the failure of Respondent to bargain in good faith with the Union (hereinafter discussed) and other asserted unfair labor practices, including the discharge of Palmer. We are therefore constrained to conclude that the Board's finding that the employees engaged in an unfair labor practice strike from the inception of their walk-out finds support in substantial evidence. See N. L. R. B. v. Wooster Div. of Borg-W. Corp., 236 F.2d 898, 906–907 (6th Cir. 1956).

We turn now to the question whether Respondent violated § 8(a) (3) of the Act by discharging the striking employees. The rule is firmly settled that unfair labor practice strikers are protected against discharge and against permanent replacement. See e. g., Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956); N. L. R. B. v. Cone Bros. Contracting Company, 317 F.2d 3, 7–8 (5th Cir. 1963), cert. denied, 375 U.S. 945, 84 S.Ct. 353, 11 L.Ed.2d 275 (1963); N. L. R. B. v. Fitzgerald Mills Corp., 313 F.2d 260 (2d Cir. 1956), cert. denied, 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963). Moreover, even though it be contended that the strikers were in fact economic strikers, we note in passing that an employer cannot lawfully terminate the employment status of economic strikers prior to the time they have been validly replaced. Vogue Lingerie, Inc. v. N. L. R. B., 280 F.2d 224, 226 (3d Cir. 1960); N. L. R. B. v. Wooster Div. of Borg-W. Corp., supra; N. L. R. B. v. Cowles Pub. Co., 214 F.2d 708, 710–711 (9th Cir. 1954), cert. denied, 348 U.S. 876, 75 S.Ct. 110, 99 L.Ed. 689 (1954).

Following the walk-out of October 30th, Respondent, on successive days, sent several letters to its absent employees, stating in effect that their continued absence was being noted by a "pink slip" in their file. On November 1st, several of Respondent's employees began picketing at various points around the plant. Respondent countered this activity with an ultimatum stating that if any employee continued to absent himself from work after 7:00 A.M., Tuesday morning, November 5th, the Company would have no choice but to conclude that such employee had voluntarily quit his employment with Comfort, Inc. without notice, contrary to the Company's policy on unexcused absences.[4]

4. [Notice sent to employees absent from October 30th on].

"November 2, 1963

\* \* \* \* \*

An examination of our records at the close of the regularly scheduled work day, Friday–November 1, 1963, indicates that you have been absent from your scheduled work at Comfort, Inc. on October 30th, October 31st, and November 1st. Further examination of our records discloses that we have no record of your calling in to report your absence or that you made any arrangements, verbally or in writing, to be absent on those above mentioned days. We must therefore assume that you have voluntarily quit your employment with Comfort, Inc.

"As of this writing, we have not closed our file on your employment record. However, if you have not returned to your regularly scheduled work on Monday, November 4th, and continue to absent yourself from your scheduled employment after 7:00 A.M., Tuesday morning, November 5th, we will have no choice but to believe that you have voluntarily quit your employment with Comfort, Inc., without notice, and your employment record will be so marked and our file closed on your employment.

/s/ R. F. Last
R. F. Last, Mgr."

Respondent's employees remained on strike beyond the cut-off date specified in the letter of November 2nd. On November 7th, the Company distributed to each of the striking employees a "Notice of Change in Employment Status," stating that such employees were considered "voluntary quits" since they failed to report for regularly scheduled work from October 30th through November 5th.[5] The Company then proceeded to hire twenty-seven new employees in the interval between November 6th and November 18th.

 The issue before us thus narrows to the question whether Respondent's letter of November 5th and its "notice of change in employment status," dated the same day, were tantamount to a discharge of Respondent's employees. We hold that such is the legal effect of Respondent's action notwithstanding the nomenclature used to describe the termination of the employment relationship. The fact that Respondent's employees received no formal notice of discharge, as was Respondent's customary practice, is immaterial, if they could logically infer that their employment status had been terminated at that point. N. L. R. B. v. Central Oklahoma Milk Producers Ass'n, 285 F.2d 495, 497–498 (10th Cir. 1960); N. L. R. B. v. Cement Masons Local No. 555, 225 F.2d 168, 172 (9th Cir. 1955). Irrespective of employer connotations, other courts have similarly construed such "voluntary quit" notices as having the legal effect of a discharge. See International Union, United A., A. & A. Imp. Wkrs. v. N. L.

R. B., 120 U.S.App.D.C. 77, 344 F.2d 171 (1965); N. L. R. B. v. Clearfield Cheese Co., 213 F.2d 70 (3d Cir. 1954). While Respondent's "pink slip" notices may have been merely tactical, strike-breaking devices designed to induce its employees to return to work, we find it clear that the November 5th notice had the intended effect of terminating the employment relationship of Respondent and its employees. Moreover, we note that in later communications with the strikers, Respondent referred to them as "former employees."

Respondent's cases of Kansas Milling Co. v. N. L. R. B., 185 F.2d 413 (10th Cir. 1950) and Shopmen's Local No. 733 v. N. L. R. B., 219 F.2d 874 (6th Cir. 1955), cert. denied, 350 U.S. 835, 76 S.Ct. 70, 100 L.Ed. 745 (1955), are distinguishable on their facts and consequently not controlling in the case at hand.[6] Considering the record as a whole, therefore, we find that there is substantial evidence to sustain the Board's conclusion that Respondent effected a discharge of his employees on November 5th, and thereby violated § 8(a) (3) and 8(a) (1) of the Act.

### SECTION 8(a) (5)—REFUSAL TO BARGAIN.

Finally, the Board sustained the trial examiner's finding and recommendation that Respondent violated § 8(a) (5) of the Act by refusing to recognize and bargain with the Union as the authorized collective bargaining representative of a majority of its employees. Respondent disputes this finding and contends that

---

5. [Notice sent to all striking employees].
 "Date Nov. 5, 1963
 Employee's Name: Junior Clark
 Employee's Clock No. 301
 Subject: Voluntary quit, without notice
 Details: Above named employee is considered a voluntary quit, without notice, since he failed to report for regularly scheduled work on October 30, Oct. 31, Nov. 1, Nov. 4 and Nov. 5, all in the year 1963. Employee failed to notify company of any reason for absence.
 /s/ Ross Pannell
 By: Ross Pannell
 Sup't."

6. Nor do we find the more recent case of the Sixth Circuit, N.L.R.B. v. European Cars Ypsilanti, Inc., 324 F.2d 606 (6th Cir. 1963), inconsistent with our decision on this issue. Although the court found that the employer's letter, which closely parallels the one at hand, did not constitute a discharge, its decision must be viewed in light of the fact that there was no evidence showing that any employee was refused reinstatement or that any strikers were replaced.

it has justifiably refused to bargain because it entertained a good faith doubt as to the Union's majority status. Respondent's objection in this regard is based upon the fact that the Union submitted no written proof of authorization to the Company or its attorney, despite repeated requests for the same. The Board, on the other hand, stresses the Union's inability to comply with the requested card check, since the authorization cards had become private documents in the hands of the National Labor Relations Board.

The basic facts underlying this issue are not in dispute. The Union initially filed a representation petition with the Board on September 30th, but it was not until October 3rd that Respondent received the Union's request for recognition by letter from its business representative, Donald Slavens. During its organizational drive through the first week of October, the Union obtained authorization cards from forty-seven of Respondent's employees, but inasmuch as it had mailed them to its Minneapolis office according to its customary practice, it was unable to comply with Respondent's request for inspection. As an alternative to the presentation of authorization cards, Slavens proposed that the Union's majority status be determined through a disinterested third party and a list of those employees who had signed authorization cards. The Company rejected such a proposal. Moreover, during the latter part of October, Respondent refused to agree to a consent election to dispose of the representation proceeding, but remained adamant in its position that authorization cards be produced or a formal Board election be held.

The law is well settled that if Respondent in good faith doubted that the Union represented a majority of its employees, it could justifiably refuse to recognize and bargain with the Union, until the latter's claim was established through the procedure of a Board election. Colson Corporation v. N. L. R. B., 347 F.2d 128 (8th Cir. 1965), cert. de-

nied, 382 U.S. 904, 86 S.Ct. 240, 15 L.Ed.2d 157 (1965); Snow v. N. L. R. B., 308 F.2d 687 (9th Cir. 1962). The employer's contention of a good faith doubt, however, may not be used merely as a pretext for some other ulterior motive in refusing to extend recognition to a Union. The case law squarely supports the proposition that when the refusal to bargain emanates from a desire to gain time to dissipate the majority status of the Union, the employer's refusal clearly violates § 8(a) (5). Jas. H. Matthews & Co. v. N. L. R. B., 354 F.2d 432 (8th Cir. 1966); Colson Corporation v. N. L. R. B., supra; N. L. R. B. v. Mid-West Towel & Linen Service, Inc., 339 F.2d 958 (7th Cir. 1964); Joy Silk Mills, Inc. v. N. L. R. B., 87 U.S.App.D.C. 360, 185 F.2d 732 (1950).

On the record as a whole we are convinced that substantial evidence supports the inference that Respondent was well aware of the Union's majority status at the inception of its organizational drive, and that it was stalling for time in the hope that the majority number of employee union adherents would wane at a later election date. Respondent's plant manager and officer, Robert Last, testified in substance that he disfavored the Union's consent election proposal because time was flowing to the advantage of the Company, and that he wished to establish his own campaign against the Union. Moreover, Last's compilation of those employees who wore union buttons demonstrates that at least forty-one out of Respondent's seventy employees chose to support the Union in this manner. In addition, a Company report, prepared by the supervisor of each department, attempted to predict how each employee would vote at a Board election. Although Last testified that the report indicated a 50/50 balance between the employees, it can be more logically interpreted as indicating that forty-one of Respondent's employees would have voted for the Union, while twenty-one would have voted against it. We also find significance in the fact that over forty of

Respondent's employees participated in the strike, a factor which seems to lend credibility to the Union's claim of majority support.

■■■ We consider the above circumstances as sufficient indicia of Respondent's refusal to bargain despite its recognition of the Union's majority status. Coupled with Respondent's subsequent unfair labor practices in discharging Palmer and its striking employees, we find substantial evidence in the record to support the conclusion that Respondent was pursuing a course of conduct geared to the disruption of the Union's majority status. Such conduct is violative of § 8(a) (5) of the Act. See N. L. R. B. v. Mid-West Towel & Linen Service, Inc., supra; N. L. R. B. v. Decker, 296 F.2d 338 (8th Cir. 1961); N. L. R. B. v. Wheeling Pipe Line, Inc., 229 F.2d 391 (8th Cir. 1956).

## THE REMEDY.

At issue in this phase of the case is the propriety of the Board's order that the striking employees are entitled to reinstatement and back pay for the period commencing on November 19, 1963, the date the Board found they offered to return to work.

On November 18th a committee representing the employees proposed to Respondent "that all employees that are outside [on strike] return to work tomorrow morning [November 19th] at 7 o'clock." Respondent's written rejection of the offer, delivered to the employees the afternoon of November 18th, stated in pertinent part: "By reason of excess absenteeism * * * since October 30th, 1963," it had permanently replaced twenty-eight "former employees" and there were thirteen positions that had not been filled. For those positions Respondent offered to consider the applications of any "of our former employees who have previously done this work." The strikers rejected the offer to consider job applications from its "former employees."

■■■ Respondent contends that the offer to return to work was conditioned upon Frank DeGeus, the properly discharged employee, being reinstated, and that since there was no unconditional offer, there is no legal basis for the Board's order requiring reinstatement with back pay. Since Respondent's employees were on an unfair labor practice strike, they did not lose their status as employees and were entitled to reinstatement with back pay, even if replacements were substituted for them during the strike. Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956). Respondent's employees had to make an unconditional offer to return to work. Philip Carey Mfg. Co., Miami Cabinet Div. v. N. L. R. B., 331 F.2d 720, 729 (6th Cir. 1964), cert. denied, 379 U.S. 888, 85 S.Ct. 159, 13 L.Ed.2d 92 (1964); N. L. R. B. v. Fitzgerald Mills Corporation, 313 F.2d 260, 269 (2d Cir. 1963), cert. denied, 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963); Baldwin County Electric Membership Corp., 145 N.L. R.B. No. 125 (1964).

■■■ The Board found, in effect, that the strikers' offer and Respondent's reply thereto, considered in context, satisfied the requirements of the law.[7]

We agree with the Board. Respondent's written refusal to accept the strikers' offer to return to work was not premised on DeGeus' inclusion in the group that requested reinstatement. Indeed, DeGeus was not mentioned. The

7. The examiner found that the offer of November 18th was a conditional one, in that Respondent was required to reinstate Frank DeGeus before the employees would return to work. The examiner further found, however, that in view of Respondent's response to the offer, to the effect that twenty-eight of the strikers had been permanently replaced, the strik-

ers were not required to make an unconditional offer, which the examiner reasoned would have been a futile and wholly useless act. The Board refrained from deciding whether the offer was a conditional one, holding that Respondent accepted the offer as indicating the willingness of the strikers to return to work. See note 6 of Board's decision and order.

878

logical interpretation of Respondent's rejection notice is that placed thereon by the Board. The Respondent made it perfectly clear that since the employees had been "discharged," and permanently replaced, any future offers for reinstatement would have met the same fate. See and compare N. L. R. B. v. Valley Die Cast Corporation, 303 F.2d 64 (6th Cir. 1962) (actual application for reinstatement held to be unnecessary to perfect employee's right to reinstatement and back pay where employer's conduct made it plain that such application would be rejected); Piasecki Aircraft Corporation v. N. L. R. B., 280 F.2d 575 (3d Cir. 1960), cert. denied, 364 U.S. 933, 81 S.Ct. 380, 5 L.Ed.2d 365 (1960), (striking employees justified by employer's conduct in concluding that their union affiliation would be a bar to further employment and that a journey to Philadelphia for reinstatement would be futile); N. L. R. B. v. Anchor Rome Mills, 228 F.2d 775 (5th Cir. 1956) (where employer's discriminatory hiring made it clear that further reapplication for employment would be futile, job applicants were not required to go through the useless procedure of reapplying for employment at a later time when jobs were actually available); N. L.R.B. v. Lummus Co., 210 F.2d 377 (5th Cir. 1954) (employer's discriminatory hiring policies made it apparent that further application on the part of job applicants would be futile and therefore unnecessary).

Respondent asserts that the findings and conclusion of the Board, and those of the examiner adopted by the Board, were motivated by and the result of bias and prejudice in favor of the Union. It argues from this premise that resolution of credibility and the Board's findings of fact should be "carefully reviewed and reconsidered."

Aside from the unfavorable result, Respondent has little upon which to rest its claim of prejudice. Our affirmance of the Board's order in substantial part, (the result of a thorough and critical examination of all of the evidence), dissipates the argument that the Board acted out of prejudice either against Respondent or in favor of the Union.

We deny enforcement of the Board's order as it relates to the discharges of Coltrain and Benedict, which the evidence establishes were lawful acts. In all other respects the Board's order is enforced.