## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## HILTON MOBILE HOMES, Respondent.

### No. 18836.

United States Court of Appeals
Eighth Circuit.

Dec. 19, 1967.

Edward E. Wall, Atty., N.L.R.B., Washington, D. C., for petitioner; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Herman M. Levy, Atty., N.L.R.B., were on the brief with him.

Thomas M. Hanna, of McMahon & Berger, St. Louis, Mo., for respondent; Alan I. Berger, McMahon & Berger, St. Louis, Mo., and Hunt & Degnan, Guttenberg, Iowa, filed brief.

Before VAN OOSTERHOUT, MEHAFFY and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

The National Labor Relations Board seeks to enforce its order of November 16, 1965. The Board found that Hilton had violated: (1) Section 8(a) (1) and (3) of the National Labor Relations Act [1]

1. National Labor Relations Act § 8(a) (1), (3), 61 Stat. 140–141, 29 U.S.C. § 151 (1964).

by discharging employees engaged in a lawful strike,[2] and (2) Section 8(a) (1) and (5) of the Act [3] by adopting and posting new plant rules with respect to employees taking home company tool boxes without prior notification to or consultation with the union.[4] It ordered Hilton to cease and desist from further commission of the unfair practices found, or otherwise interfering with the rights of its employees. Affirmatively, it required Hilton to make the discharged employees whole and to post appropriate notices.

We enforce the Board's order as it relates to Issue One, but decline to do so as to Issue Two.

I. *The discharge of employees engaged in a lawful strike.*

The union was certified by the Board as the exclusive bargaining representative of Hilton's production and maintenance employees on July 8, 1963. Intermittent negotiations carried on from that date to May, 1964, failed to produce an agreement. Early on the morning of May 6th, twenty-nine employees went out on strike. They were subsequently joined by a few others. About 10:00 a. m., Jack Degnan, counsel for Hilton, read a statement to the strikers assembled in the vicinity of the plant:

> "You have voluntarily left your job. This is an unwarranted work stoppage. Unwarranted work stoppages such as this are not protected by the National Labor Relations Board.
>
> "Since this is the first time that there has been such a work stoppage at this plant, we are giving you an opportunity to return to your jobs within ten (10) minutes after the end of these remarks. In the event that you fail or continue to refuse to return to your job within the ten minutes allowed, such failure shows us that you no longer want to work on your job and desire

to voluntarily quit, and our records in this plant will show that you have voluntarily quit your job.

> "Employment in this factory will be replaced by individuals who want and need work. You are further advised that in the event of any similar acts of work stoppage such as this, that such acts will be grounds for immediate discharge."

After reading the statement, he added that the strikers "had until 10:30 a. m. to return to work, and that if they did not do so they would have to start as new employees at $1.25 per hour."

The union's business agent learned of the strike shortly after the walkout and immediately went to the plant. He arrived shortly after Degnan had completed his remarks. He was told, by the strikers, that they had been discharged "as of now." He then entered the company premises and discussed the matter with Degnan. He offered to ask the men to return to work without the loss of rights, but Degnan said he could do nothing until he took the matter up with a company vice-president.

The business agent returned after lunch and again requested that the strikers be permitted to return to work without loss of rights. Later in the day, Degnan informed the business agent that the company would not put the strikers back to work.

Still later in the day, the company sent a letter to each of the strikers in which it stated:

> " * * * Your failure to return to work indicates to us that you have quit your job and no longer desire to be an employee of Hilton Mobile Homes. * * *
>
> " * * * and will take the necessary steps to fill your job on a permanent basis.

---

2. Hilton does not question the Board's decision that Hilton had violated Section 8(a) (1) of the Act by threatening strikers with discharge if they struck again after returning to work.

3. National Labor Relations Act § 8(a) (1), (5), 61 Stat. 140–43, 29 U.S.C. § 151 (1964).

4. Key Lodge No. 1238, International Association of Machinists, AFL-CIO.

"* * * [Y]our final check will be processed and mailed to you."

A copy of the letter, together with an explanation, was posted on the bulletin board. The explanation stated: "We are now making every effort to fill the vacancies in our employment structure when some of our employees quit their jobs yesterday."

It is now conceded by Hilton that the strike was not unlawful. It contends, however, that it did not discharge the employees on May 6th, but rather notified them that they would be replaced unless they returned to work immediately. It contends it had a right to do so as the employees were economic strikers who could be replaced. Whether Hilton's statements constituted an unlawful discharge depends on whether they would reasonably lead the employees to believe that they had been discharged. N.L.R.B. v. Comfort, Inc., 365 F.2d 867, 875 (8th Cir. 1966); N.L.R.B. v. Trumbull Asphalt Company of Delaware, 327 F.2d 841, 843 (8th Cir. 1964); N.L.R.B. v. Central Okl. Milk Producers Ass'n, 285 F.2d 495, 497–498 (10th Cir. 1960); National Labor Rel. Bd. v. Cement Masons Local No. 555, 225 F.2d 168, 172 (9th Cir. 1955).

The facts here closely parallel those in *Comfort* where economic strikers were sent the following notice:

"* * * [I]f you have not returned to your regularly scheduled work on Monday, November 4th, and continue to absent yourself from your scheduled employment after 7:00 A.M., Tuesday morning, November 5th, we will have no choice but to believe that you have voluntarily quit your employment with Comfort, Inc., without notice, and your employment record will be so marked and our file closed on your employment."

Id., 365 F.2d at 874 n. 4.

Judge Matthes, speaking for the Court in *Comfort,* noted:

"* * * an employer cannot lawfully terminate the employment status of economic strikers prior to the time they have been validly replaced. Vogue Lingerie, Inc. v. N.L.R.B., 280 F.2d 224, 226 (3d Cir. 1960); N.L.R.B. v. Wooster Div. of Borg-W. Corp., [236 F.2d 898 (6 Cir.)]; N.L.R.B. v. Cowles Pub. Co., 214 F.2d 708, 710–711 (9th Cir. 1954), cert. denied, 348 U.S. 876, 75 S.Ct. 110, 99 L.Ed. 689 (1954)."

Id. at 874. Judge Matthes went on to state:

"The issue before us thus narrows to the question whether Respondent's letter of November 5th and its 'notice of change in employment status,' dated the same day, were tantamount to a discharge of Respondent's employees. We hold that such is the legal effect of Respondent's action notwithstanding the nomenclature used to describe the termination of the employment relationship. The fact that Respondent's employees received no formal notice of discharge, as was Respondent's customary practice, is immaterial, if they could logically infer that their employment status had been terminated at that point. * * * Irrespective of employer connotations, other courts have similarly construed such 'voluntary quit' notices as having the legal effect of a discharge. * * * While Respondent's 'pink slip' notices may have been merely tactical strike-breaking devices designed to induce its employees to return to work, we find it clear that the November 5th notice had the intended effect of terminating the employment relationship of Respondent and its employees. Moreover, we note that in later communications with the strikers, Respondent referred to them as 'former employees.'"

Id. at 875.

Here, as in *Comfort,* we find that the actions and statements of Hilton, on May 6th, had the intended effect of terminating the employment relationship of the striking employees, and was thus an unlawful discharge.

## THE REMEDY FOR THE UNLAWFUL DISCHARGES

The Board ordered Hilton to pay the strikers back pay from the day following the day their offers to return to work were received by Hilton until the day of their reinstatement or the day work was made available to them.

There is no dispute as to the date on which the employees offered to return to work, but Hilton contends that it offered, by a letter dated June 24, 1964, directed to each striker, to reinstate them as of that date. It, therefore, urges that its responsibility for back pay should terminate then, rather than on July 23rd, 1964, the date fixed by the Board.

The June 24th letter read as follows:

"This letter is written prior to our next negotiating session so, if you wish, you can refresh your recollection on some of the matters we proposed to you at our last bargaining session on May 27th and May 28th, 1964.

"You recall we spent considerable time discussing the plight of those economic strikers who had been permanently replaced prior to their respective offers to return to work. The Company stated that in order to alleviate this plight and to try and get these strikers back to work, it would change its operation in such a way as to create *new jobs* for these people. *These new jobs* would be very similar to those held by these strikers prior to the strike, but with few minor changes.

"The Company production process prior to the strike required a crew of men to work on one line for awhile, and to switch to a second line for awhile, and then switch back to the first line, and so on. Now, it was proposed by the Company that it would set up two crews and eliminate the switching back and forth. The elimination of the switching back and forth would be one of the main changes in the new jobs from that of the old. In any event, these replaced strikers were offered the same rate of pay for these new jobs as that which they had on the jobs they left on the occasion which we subsequently learned was a strike." (Emphasis added.)

Those who had not returned by July 23, 1964, were sent a second letter which read as follows:

"We are in need of qualified workers and with our new facility starting up, we have jobs that need to be staffed and we want to fill those jobs with as many experienced people as possible. Even though you have failed to accept reinstatement to your old job, we feel you may have a desire to work in view of the new facility. *Therefore, we again offer you a job at your former or substantially equivalent position, without loss of or prejudice to any of your former rights and privileges.* You have not seen fit to accept our previous offers. With this new facility we really need you and your experience, because of this great need, we are willing to offer you as an experienced man, the foregoing terms of employment.

" * * * We must have your reply promptly, not later than Monday, August 3rd, 1964, 7:30 A.M." (Emphasis added.)

A reading of the June 24th letter indicates clearly that Hilton did not intend to enlarge on its proposals of May 27th and 28th, which proposals made it clear that the employees would have to return as new employees and would thus lose their seniority rights.[5]

---

5. The Trial Examiner specifically found:
   "On May 28, McMahon stated that Respondent was inaugurating another line and that, as a consequence, it would be willing to take back about 15 strikers at a reduced pay but without restoring to them their seniority 'or any of their rights.' But Grogan and the employees out of work rejected this offer.

   * * * * *

   "At the May 27 and 28 meetings, McMahon offered to take back about 15 strikers at 'similar jobs' and 'similar pay' because of increased production. 'Similar pay' was less than their old pay. But Grogan wanted them back at the 'same job' and the 'same rate of pay. No similarity,' and with seniority.

A reading of the second letter of July 23rd, on the other hand, makes it equally clear that their seniority rights were to be restored if they returned.

We concur with the Board's decision that an offer of reinstatement which excludes seniority rights is not an offer of substantially equivalent employment, and affirm its finding that Hilton's responsibility for back pay was not terminated by the June 24th letter.

II. *The tool box issue.*

The complaint alleged that Hilton had violated Section 8(a) (1) and (5) of the Act by posting new plant rules on February 1 and April 13, 1964.[6]

The February 1, 1964, rules related to smoking, talking, making phone calls, disposing of garbage, engaging in horseplay, going from one building to another and removing of company (or another individual's) property from the premises without permission.

The April 13th rule provided:

"Effective April 13, 1964, the practice of employees taking a tool box home at any time must discontinue. The only tools an employee is required to furnish is a hammer, tape measure and/or nail set. Make a list of the tools you now furnish. This list is to be given to the lead man of your department. Factory tools and supplies may not be taken home under any circumstances. Any employee violating this notice shall be subject to discharge."

The Trial Examiner found that Hilton violated Section 8(a) (1) and (5) of the Act by adopting and posting each of the rules. He stated in part:

"About February 1, 1964, [Hilton], without notifying or discussing with the Union, posted certain work rules * * *. [Hilton] contends that it negotiated the right to post rules. But its evidence shows, * * * only that rules were discussed and that such discussions were in connection with [Article III, the management clause] * * *. But [this clause], although agreed upon and initialed by the parties [was] expressly subject to ratification by the employees, who had not yet voted on [it]. Moreover, I find that the parties discussed horseplay, smoking, and other matters, but no agreement was reached that [Hilton] was free to adopt rules thereon unilaterally. * * *

* * * * * *

"* * * [Hilton] contends [that the February rules] were discussed with the Union prior to their being posted. However, I find only that [Hilton] objected to horseplay and other matters, such as smoking, and [the union business agent] agreed, but that this does not amount to negotiating thereon. [Hilton's] contrary evidence is not credited. I further find that these rules were posted unilaterally, i. e., without negotiating or consulting thereon with the Union.

"[Three employees] testified that no rule prior to April 1964 prevented an employee from taking tool boxes home. About April 1964, a new rule was posted that no company tools could be taken home without permission. No notice thereof was given to the Union prior to its promulgation. Hence I find this action was unilateral."

The Board, in reviewing the Trial Examiner's findings, stated:

"The Trial Examiner found that Respondent violated Section 8(a) (5) when on February 1, 1964, it posted certain rules pertaining to employee conduct in the plant. The record shows that the bulk of these rules related to garbage and trash disposal, horseplay, smoking, telephone calls, and *the taking of company property from the premises.* The Trial Examiner found that, during negotiations, plant rules relating to 'smoking, horseplay and other matters' were discussed with the Union. In these circumstances, we dis-

---

"* * * McMahon then offered to take back some strikers at 'similar jobs' and at their former same rate of pay, but without seniority. * * *"

6. It also alleged other unilateral acts by Hilton in violation of the same sections. Either the Examiner or the Board found for Hilton on the other unilateral acts.

agree with his conclusion that Respondent violated Section 8(a) (5) when, on February 1, 1964, following these discussions, it posted the rules. *We agree, however, with the Trial Examiner that Respondent violated 8(a) (5) of the Act when, in April 1964, it unilaterally posted a rule prohibiting the taking of tool boxes home.* It appears that theretofore employees had been permitted to use company tools at home. In such circumstances, we conclude that the unilateral discontinuance of this employment privilege violated Section 8(a) (5) of the Act." (Emphasis added.)

In our view, the disparate treatment of the February and April rules by the Board cannot be justified. The logic of a holding that sustains the imposition of a general rule against removing company property from the premises but refuses to sustain a more particularized rule on the same subject matter escapes us. Nor can the disparate treatment be justified on the grounds that the February, but not the April, rule was discussed in negotiations. The record, contrary to the Examiner's findings, shows that the April rule was also a subject of discussion in them.[7]

Hilton urges two additional grounds for refusing to enforce the Board's decision on tool boxes: (1) that the tool box issue was not a subject of mandatory bargaining, and (2) that if the rule was, in fact, bargainable, the parties had bargained to an impasse on the issue. While the decision of the Board is contrary to Hilton's position on these issues, neither the Examiner nor the Board discussed nor made specific findings with reference to them.

We do not feel that the holdings of the Board on these issues are supported by substantial evidence. What evidence there is in the record supports Hilton's position that the rule was necessary for the protection of its property against theft or fire, and fails to support the Board's position that the right to take tool boxes home was a fringe benefit which could not be discontinued by the company.

We also believe there was substantial evidence in the record to support a holding that the parties had bargained to an impasse on the issue and little, if any, evidence to support a contrary one. At the start of negotiations, the parties agreed that non-economic issues would be discussed first. On February 1, 1964, the Negotiating Committee reached a final agreement (subject only to the ratification by the membership) on all non-economic issues, including a management clause which gave Hilton the right to make and apply rules that were not willfully discriminatory nor in conflict with the agreement. The agreement required the company to make the rules available to all employees but did not require that the union consent to them prior to their being published. By April, it was clear that the rank and file objected to the management clause. It was equally clear that Hilton insisted on it and that an impasse had developed.

In view of the facts: that the record does not support a finding that the tool box rule was a subject of mandatory bargaining; that there is substantial evidence in the record that the parties had bargained to an impasse on the issue; and that there is no reason for the Board's disparate treatment of the February and April rules, we decline to enforce the Board's order insofar as it relates to the tool box issue.

The Board's order is enforced except insofar as it relates to the tool box issue. We deny enforcement with respect to it. The matter is remanded to the Board for action consistent with this opinion.

---

7. "Q. Was there a discussion about the tool boxes, do you recall that? A. There was some discussion about the tool boxes, yes. More between the committee and Mr. Degnan than myself.

"Q. What they were concerned with there was the possibility of theft? A. Theft and fire, and so on and so forth; yes."