**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ANCHOR ROME MILLS, Inc., Respondent.**

**No. 15503.**

United States Court of Appeals Fifth Circuit.

Jan. 17, 1956.

Rehearing Denied March 8, 1956.

Maurice Alexandre, Atty., N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel N.L.R.B., David P. Findling, Assoc. Gen. Counsel N.L.R.B., Washington, D. C., Theophil C. Kammholz, Gen. Counsel, Samuel M. Singer, Washington, D. C., for N.L.R.B.

Frank A. Constangy, Atlanta, Ga., John W. Maddox, Rome, Ga., Mildred McClelland, Atlanta, Ga., Matthews, Maddox, Walton & Smith, Rome, Ga., for respondent.

Before HUTCHESON, Chief Judge, and BORAH and BROWN, Circuit Judges.

BORAH, Circuit Judge.

This case is before the Court on petition of The National Labor Relations Board, seeking enforcement of its order[1] requiring respondent, Anchor Rome Mills, Inc., to cease and desist from certain unfair labor practices and to take specified affirmative action which the Board found would effectuate the policies of the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq.[2]

The material facts which give rise to the two charges filed against respondent are these: The Textile Workers Union of America, C.I.O., certified bargaining representative of respondent's employees, failed to reach an agreement with respondent on the terms of a new contract and on March 18, 1948, approximately 350 employees went out on strike. The respondent had little difficulty replacing the strikers and plant operations continued.

In another proceeding[3] the Board found the strike to be an economic one. Accordingly, the Board held that respondent should not be required to reinstate the strikers to their former positions if to do so would require the discharge of replacements.

The initial charge in this case was filed on November 18, 1949, and served on November 23, 1949; it contains the following allegations: "The Employer, in order to discourage membership in a labor organization, on, before *and after May 15, 1949*,[4] discriminated in regard to the hire and tenure of employment and to the terms and conditions of employment" of 346 named strikers, respondent's former employees, and further that by these and other acts and conduct, *within the past six months*, "the Employer had interfered, restrained and coerced its employees in the exercise of their rights as guaranteed in Section 7 of the Act." A second charge was served on respondent on May 24, 1950, which, in broad language identical to that in the first charge, set forth respondent's discrimination on and after November 20, 1949, and *"within the past six months"*, against Ellen Langham, a non-striker former employee. On March 31, 1953, the General Counsel issued a consolidated complaint which set forth the days in the year 1949 on which the 346 named strikers applied for reemployment and in which it was alleged that "on or about January 14, 1949, *and at all times thereafter*, Respondent refused to reemploy" the named persons "because of their membership in and activity on behalf of the Union, and because they engaged in the strike * * *" Further discrimination was alleged in that one Minnie H. Mize, a non-striker former employee "in

1. The Board's decision and order are reported at 110 N.L.R.B. No. 162.

2. Hereinafter referred to as "the Act."

3. Anchor Rome Mills, 86 N.L.R.B. 1120.

4. All italics herein are supplied.

or around February, 1949, July, 1949, March, 1951, and at *various other times*," applied for "reinstatement or reemployment" and that respondent refused in "February, 1949, *and at all times thereafter*," to reemploy her because of her membership in the Union and particularly because her husband and her father engaged in the strike. Similar allegations were made as to Ellen Langham, the person named in the second charge.

On November 25, 1953, the trial examiner issued his intermediate report and his findings of fact, conclusions and recommendations were based *solely* upon the evidence relating to acts occurring on and after May 23, 1949, the six-months cut-off date preceding the date on which the first charge was served. The Board adopted the trial examiner's report with the additions and modifications to which we shall hereinafter refer. In summary, the examiner's findings were: That there was a surplus of textile labor in the area; that respondent maintained a valid practice of "hiring at the gate" through a personnel office—did not keep a formal application file—that applicants were required to apply in person for interview and no applications by telephone were accepted. That it was respondent's general practice to hire applicants who were under fifty years of age, but it sometimes deviated from that rule. That preference in employment was given to employees in a lay-off status and to relatives of its employees. That the personnel director frequently posted a "No Help Wanted" sign to discourage applicants but more than 100 persons appeared seeking work on each of the three mornings a week scheduled by the personnel office for interviews. That during the period aforementioned, the personnel director made inquiries and statements to at least five striker-applicants which had a tendency to discourage the strikers from applying for reemployment; and that this conduct on his part clearly evinced respondent's intent and policy not to reemploy any

former striker.[5] The examiner further found that the filling of vacancies in respondent's plant were peculiarly within its knowledge and control; that as to non-strikers whom it desired to hire, it frequently tendered vacant jobs to them long after they had applied in person for employment, but that respondent never followed this practice as to striker-applicants. He also found that the refusal to hire Minnie H. Mize and Ellen Langham was based upon their relationship to strikers and because of their sympathies for the Union and the strike. The trial examiner made detailed findings as to the number and classification of vacancies filled after May 23, 1949, and likewise an analysis of the job qualifications of and dates of personal application for unconditional employment by the former employees. Specifically, he found (1) that following the personal applications for employment by sixty-two of the named applicants job openings were available which each was qualified to fill, and (2) that absent a discriminatory policy, respondent would have considered the applications of sixty former strikers and of Minnie Mize and Ellen Langham for present *or future* employment as it did in the case of numerous non-strikers. The Board, in general agreement with the examiner's analysis and findings, observed: "In our opinion, it was the continued operation of this discriminatory policy and not the lack of vacancies at the time of application that affirmatively prevented the 60 former strikers who applied * * * from receiving employment. Moreover, under the circumstances herein, we believe that, once having made their application for employment * * * it was not necessary for the 60 strikers thereafter to repeat the useless gesture of applying again and again in order to establish the Respondent's responsibility for the discrimination practiced against them." The Board in agreement with the trial examiner found that the re-

---

5. The Board concurred in this finding and, in addition, cited evidence of occasions on which other of the respondent's su-

pervisors reiterated discriminatory intent and policy against the former strikers.

spondent had violated the Act with reference to Minnie H. Mize and Ellen Langham, relatives of strikers, by extending "its discriminatory policy against former strikers to such relatives."

On the basis of these findings and conclusions the Board ordered respondent to cease and desist (a) from discouraging membership in the Union by discriminating in regard to hire or tenure of employment of employees; (b) interrogating applicants for employment concerning their union or protected concerted activities in a manner constituting interference, restraint or coercion in violation of Section 8(a)(1) of the Act and informing them that they will be denied employment because of such activities, and (c) in any other manner interfering with, restraining or coercing its employees in the exercise of their rights. Affirmatively, it ordered respondent to offer to the sixty named striker-applicants and to Minnie H. Mize and Ellen Langham, immediate employment with such seniority or other rights and privileges as each would have enjoyed had each been employed on the dates when, absent respondent's discrimination, the respondent would have employed them in accordance with non-discriminatory hiring practice, and to make whole these persons for any loss of pay each may have suffered as a result of respondent's discrimination, from the respective dates of discrimination to the dates when each is offered employment; the date from which back pay should run to be determined (in subsequent proceedings) by fixing the date on which each would have been employed by respondent in accordance with non-discriminatory hiring practice.

The respondent resists enforcement of the order upon the grounds that the complaint was barred by Section 10(b) of the Act, and that the Board's findings and conclusions upon which its order is based are not supported by substantial evidence.

On the assumption that the Board predicated its order solely upon the finding of respondent's implementation of a discriminatory policy after May 23, 1949, respondent argues that the evidence shows that such policy, if unfair, had actually been announced and implemented by the hiring of non-strikers in preference to striker-applicants, long before this date; and that since such "implementation" should be considered a single and non-continuing offense, the unfair labor practice, if any, had prescribed before the initial charge was served. Respondent further contends that the allegations in the complaint relating to Minnie H. Mize are not supported by a charge, as required by Section 10(b) of the Act, and that the complaint with reference to Ellen Langham was barred because the charge was filed more than six months after the date of the acts complained of in the charge.

Respondent's first contention is clearly without merit. The two charges were couched in broad language. They referred to a *series* of separate, discriminatory acts in respect to certain individuals named therein, "on, before and after" specified dates, and to "other acts and conduct within the past six months". The courts have repeatedly held that "The six month limitation refers only to acts that occur before the charge and does not prohibit the inclusion of similar or related acts happening after the charge." N.L.R.B. v. Kohler Co., 7 Cir., 220 F.2d 3, 8. Furthermore, the findings and order of the Board negative any suggestion that the respondent is being subjected to liability for any unfair labor practice occurring more than six months before service of the initial charge. Accordingly, in respect to the persons named in the two charges, we hold that the Board was correct in finding that the complaint was not barred by Section 10 (b) of the Act. It is true, as respondent points out, that in neither of the charges was Minnie H. Mize named as one of the discriminatees, but under the principle enunciated by this Court in Cathey v. N.L.R.B., 5 Cir., 185 F.2d 1021, affirming Per Curiam 86 N.L.R.B. 157, the Board was empowered to include in its com-

plaint allegations of respondent's discrimation against her.

■ The principal question here is whether there is substantial evidence in the record considered as a whole, supporting the Board's finding that respondent, in violation of Section 8(a)(1) and (3) of the Act, discriminated against the persons named in the order. Respondent's chief defense was that it failed to rehire these applicants because no vacancy existed on the occasions when they applied for reemployment. Without undertaking to summarize the evidence which we have detailed above, we deem it sufficient to say that we are in agreement with the Board that there is no merit in respondent's defense that no jobs were actually available at the time when the named applicants applied. Where, as here, it is apparent from the discriminatory hiring policy that further application for employment would be futile, job applicants were not required to go through the useless procedure of reapplying for employment at a later time when jobs were actually available in order to establish that they were victims of the discriminatory hiring policy. N.L.R.B. v. Lummus Co., 5 Cir., 210 F.2d 377. However our inquiry does not here end for in addition to establishing respondent's discriminatory intent, it is necessary also to find that as to each of the sixty-two persons named in the complaint the record supports the Board's order, inasmuch as that order is predicated upon findings (1) that each of the persons named complied with respondent's hiring policy by making a personal, unqualified application for new employment in a position which was vacant or in which a subsequent vacancy occurred; and (2) that a non-striker was hired in such vacancy in preference to each applicant. Under the terms of the order which commands respondent to make the named persons whole as of a certain date, it is also essential that the record show a specific date upon which a non-striker was employed in a particular job for which each striker-applicant was qualified.

■ We are of the opinion that substantial evidence in the record considered as a whole supports the Board's findings that respondent discriminatorily failed to reemploy thirty-five of its former employees [6] and respondent's objections as to them are without merit.

■ The evidence considered as a whole likewise shows that although eight of the applicants [7] were above fifty years of age the objection as to Prince's age was not raised by respondent below and consequently cannot now be urged here. As to the remainder, seven were told merely that no vacancies existed, and Nelson was advised only that he was "too old to learn" a *new* job, and not that he was too old to perform his former duties. Accordingly, it would appear that the question of age even if applicable to new and unexperienced employees, was nothing more than an afterthought, and respondent's claim that it refused employment to these applicants because of their age is unpersuasive.

■ As to four of the persons named in the order,[8] the respondent urges that the record does not support the Board's finding that they actually made *unqualified* applications for new employment. We agree. Carter testified that he went to the plant to see about a birth certificate and that "while I was over there I just asked Mr. Booker [assistant personnel director] about a job, about *my* job. He said he was full up." Burl Hart applied for a job as a picker hand in 1950 and

---

6. Allred; Astin; Atkins; Barber; Castleberry, Lloyd; Collum; Cronan; Davenport, Annie; Duck; Edwards; Elliott; Farmer; Gore; Hall, Leo C.; Hall, Virginia Ruth; Hall, Clarence J.; Hart, Mary Frances; Hyde; Langham, Ellen; McComb; Maxey; Mize; Moseley; Payton; Reynolds; Robertson; Shedd; Shepherd; Shiflett, Dorothy; Shores; Vanhorn; Vinson, Charlie; Vinson, Opal; White; and, Wilson.

7. Blalock; Boswell; Brannon; Courson; Nelson; Prince; Scruggs and Thompson.

8. Carter; Hart, Burl; Langham, G.; and Locklear.

1952, but there is no testimony that he had applied simply for "a job" as did the applicants who made unqualified requests for "reemployment", as distinguished from "reinstatement". George M. Langham swore that he applied for reinstatement and requested "my job back". Locklear, a quiller, testified that when she made her only request for employment she asked for a quiller job, and such request was not made to the personnel director nor on a regular interviewing day.

Respondent next challenges the Board's finding that eight former strikers named in the order[9] made valid applications for reemployment in accordance with the requirement of personal interviews. The evidence shows that Bright, Cadle, Case and Turner did come to the plant and either waited in the reception room until they were advised by a secretary that the respondent was "not hiring anybody", or saw the sign "No Help Wanted" on the door and left. None of these four ever saw or talked with the personnel director or his assistants. Claude Castleberry came to the plant but was met in the hall near the door of the employment office by the personnel director who advised him that respondent did not need any help at present and no other attempt to apply was made by Castleberry. Henry's only applications for employment were made by telephone, by informal inquiries in the local bus station, and of plant supervisors who visited her home. Maynor went to the personnel office, waited in the reception room with fifteen or twenty other applicants during the interview hours until the personnel director appeared and advised all who were there to go home because "there wasn't any need talking to one at a time, they wasn't hiring anybody." William C. Swindle testified, in part: "I didn't go in. There was no record [of the date of his application] because I didn't get in. As I was going in at the gate * * * in-

to the personnel office * * * I met Mr. Booker * * * and he just told me there wasn't no use going in, there wasn't nobody in there. So, I didn't go any further and I didn't go back any more."

This being the state of the record and upon consideration of the fact that the Board's order is predicated upon the finding that each of the persons named therein had "substantially complied with hiring policies of the Respondent and *applied in person* to the personnel director or his authorized assistants for unconditional employment in any available jobs," there is, there can be no basis for a finding that these eight individuals were denied employment and the Board's finding to the contrary does not find support in the record when considered as a whole.

Respondent further contends that even if it did in fact *adopt a discriminatory* hiring policy, four[10] discriminatees were either incorrectly classified by the trial examiner or were not qualified for the jobs filled after they had applied, and that the issue of qualification is relevant to the question of discrimination as well as back pay. As to Cook, the evidence shows that she had been a cloth inspector, but the examiner concluded that she was qualified for any and all inspector's jobs and found discrimination against her in the subsequent employment of five inspectors no one of which appears to have been a cloth inspector. Green was a twister doffer, but was classified by the examiner as a spinning doffer. However, the record does not show that a twister doffer was hired subsequent to Green's application in July, 1950; and while we cannot on this record say that he was qualified to hold other subsequently available jobs in the twister room, the record does affirmatively show that his classification as a spinning doffer was patently erroneous. Rachel B. Johnson was a warper creeler with experience in

9. Bright; Cadle; Case; Castleberry, Claude; Henry; Maynor; Swindle; and Turner.

10. Cook; Green; Johnson, Rachel B.; and Lambert.

the *weave room,* not, as found by the examiner, in the *twisting room.* She applied for work in November, 1952; and in December, 1952, another employee who had quit more than a year previous was hired as a warper creeler. M. R. Lambert, a baler, was found by the examiner to be qualified as a semi-skilled spare hand in the weaving room, as well as a repacker or a sweeper which are relatively unskilled jobs. The evidence, however, does not support the specific finding that he was experienced and qualified for the spare hand position, but the trial examiner was otherwise correct in his findings with respect to Lambert. Our consideration of the record as a whole does not permit us to say that a finding of discrimination against Annie Cook or Lee Green is warranted, but as to Rachel B. Johnson there was discrimination in respondent's preference for a non-striking former employee in the warper creeler vacancy which occurred the very next month after Johnson's application. Discrimination was likewise practiced against M. R. Lambert by denying him equal opportunity to fill the jobs of repacker and sweeper. Therefore, the order as to Cook and Green must be modified accordingly.

■■■ Respondent next contends that William E. Shiflett, a striker and president of the local, who was convicted of violence during the strike, and Lee, a striker, who had cursed employees going to work while he was on the picket line, were not entitled to reemployment because of their respective violent conduct and opprobrious language. From the evidence it is clear that at no time after May 23, 1949, did respondent state to either Lee or Shiflett that they were not being considered for reemployment on the grounds of their misconduct. On the contrary, the evidence convincingly shows that respondent did in fact refuse their applications for the reason there were no present available vacancies for either of them. Accordingly, we hold that the Board properly accorded them relief along with the other discrimina-

tees. Cf. N.L.R.B. v. Wallick, 3 Cir., 198 F.2d 477, 484.

■■■ Finally, respondent contends that notwithstanding the fact that Forsythe applied for reemployment after May 23, 1949, he is not entitled to reemployment because he was reemployed during the strike and thereafter voluntarily quit for the reason that other workers expressed resentment toward him because of the language he directed at them while he was on the picket line. The petitioner, on the other hand, contends that Forsythe did not quit voluntarily, but was forcibly evicted from the plant with respondent's knowledge and apparent condonation, and in any event, that the question is not relevant to the issues presented, for after his forcible eviction Forsythe rejoined the picket line, subsequently applied for employment, but was not hired although respondent thereafter filled a number of jobs in his classification. But, be this as it may, we need not consider respondent's contention because we do not find that, at any stage of the proceedings before the Board, the objection now urged as to Forsythe was specifically presented to the Board, or that there are any "extraordinary circumstances" which would excuse respondent's failure to do so. Accordingly, this Court by virtue of Section 10(e) of the Act is without authority to consider the issue raised here for the first time. Cf. Marshall Field & Co. v. National Labor Relations Board, 318 U.S. 253, 63 S.Ct. 585, 87 L.Ed. 744.

By reason of the foregoing, the Board's order is amended so as to eliminate from paragraph 2(a) and (b) thereof, and Appendix B, the inclusion of John C. Carter, Burl Hart, George M. Langham, Effie Locklear, Alma Pugh Bright, Elmer Cadle, Lida B. Case, Claude Castleberry, Irene Henry, Sally Maynor, William C. Swindle, Sidney Turner, Annie J. Cook and Lee Green. The notice to be posted is similarly amended. As thus amended, the Board's order is

Enforced.