[Civ. No. 18732. Fourth Dist., Div. One. June 12, 1980.]

KAWANO, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

938

COUNSEL

Gray, Cary, Ames & Frye, David B. Geerdes, John M. Phelps and James K. Smith for Petitioner.

Ellen Lake, Marvin J. Brenner, Thomas M. Sobel, Manuel M. Medeiros and Jorge Carrillo for Respondent.

Marco E. Lopez, Carlos M. Alcala, Francis E. Fernandez, Carmen C. Flores, William H. Carder, Jerome Cohen, Sanford N. Nathan, Tom Dalzell, Ellen Greenstone, George C. Lazar, Dianna Lyons, James Rutkowski and Kirsten L. Zerger for Real Party in Interest.

OPINION

**BROWN (Gerald), P. J.**—Kawano, Inc. (Kawano) an agricultural employer subject to the provisions of the Agricultural Labor Relations Act (Act) (Lab. Code, § 1140 et seq.), seeks review of an order of the Agricultural Labor Relations Board (Board) finding Kawano has committed unfair labor practices under the Act and decreeing certain remedies.

Kawano grows truck crops such as tomatoes, strawberries and cauliflower on land in San Diego County, some owned and some leased. Its president, chiefly responsible for management decisions, is John Kawano (John), assisted in operating the business by other family members, including his brother Harry Kawano. Its supervisory employees include numerous foremen who hire and fire field laborers and oversee their work. Field workers are normally hired seasonally on an as-needed basis at the fields and fall into two categories: so-called "legals," who are Mexican nationals with valid immigration status in this country and who commute to the Kawano fields from border communities such as San Ysidro and Tijuana; and "illegals" or "casuals," who as their name implies, are illegal immigrants.

Kawano headquarters are located at its 200-acre San Luis Rey ranch, where it maintains a small administrative office staffed by three women and managed by John's nephew Ron Mizushima. There is a packing shed nearby.

The four Kawano brothers who are petitioner's sole shareholders (John, Frank, Raymond and Harry) have farmed in north San Diego County since 1946, and petitioner was incorporated in 1960. The acreage under cultivation and the number of employees on Kawano's payroll both vary from season to season depending on what crops are grown and other factors. Also, the size of the work force fluctuates seasonally; manpower needs are greatest as the harvest season approaches in late summer and fall off almost to nothing towards January.

The charges with which we are concerned arise out of events during the summer of 1975 when the United Farm Workers (UFW) launched an organizing drive among Kawano's field employees. After UFW was elected bargaining representative of Kawano's employees in August 1975, it brought before the Board unfair labor practice charges. The Board found Kawano had committed the following unfair labor practices: (1) after a normal seasonal layoff in January 1976, Kawano discriminatorily refused to rehire 52 "legal" workers on account of their union support; (2) it discriminatorily laid off 5 employees, then rehired them but assigned them to unusually difficult work different from their customary jobs, as penalty for union activity and also to isolate them from other workers.

The final Board order provides: 1. Kawano must reinstate 48 employees (discriminatees) who petitioner discriminatorily refused to rehire;

2. Kawano must compensate the discriminatees for lost wages for the 1976 and 1977 growing seasons, to be calculated for each employee by assuming he would have worked the same number of hours in each of 1976 and 1977 as he did work in 1975. Kawano may rebut the assumption as to any employee in later backpay proceedings;

3. Kawano must reassign five discriminatees who were rehired. They had been assigned to picking cherry tomatoes. The evidence showed cherry tomato picking was more arduous than picking "round" tomatoes and cherry tomato work was traditionally reserved for illegal alien workers rather than "legals" such as the five here involved. Kawano

must reassign the five to "work that they have customarily performed in the past, without segregating or isolating them from other workers;

4. Kawano must sign, post, and mail notices of its intent to discontinue unfair labor practices and to comply with the Act in the future, and must broadcast its retraction "in all appropriate languages" on "a radio station in the southern San Diego County area, once a week for four weeks" during the next peak hiring season.

Kawano contends insufficient evidence supports the Board order. It particularly questions the soundness of the Board's reliance on proof Kawano discriminated against legal workers as a class in its 1976 and 1977 hirings, contending not only was such class discrimination not adequately proved, but also not all the individual 52 discriminatees have been proved to be victims of discrimination according to the standards of proof established by federal precedent under the National Labor Relations Act in discriminatory failure to rehire cases. In many individual cases here, the Board dispensed with requiring proof of reapplication for a job to someone with authority to hire (i.e., a foreman), because the Board believed the existence of a policy against hiring legals made it impossible or futile for them to make specific work applications. Thus the administrative law officer (ALO) stated: "There is relatively little evidence tending to prove that Respondent discriminated against individuals apart from their class membership. Many of the alleged discriminatees did not apply for rehiring to those with authority to hire."

Similarly, the Board decision recites: "We find the evidence supports the ALO's conclusion that Respondent abandoned its former method of hiring legals from Tijuana-San Ysidro without notice to them, and refused to acknowledge their reasonable attempts to apply for work in other ways. The ALO found, and we agree, that the employees named in the complaint were available for work, and that the Employer hired many more than their number of employees during 1976 and 1977. Under these circumstances, we find the General Counsel was not required to prove specific application and availability of work as to each discriminatee."

Kawano also asserts improper use here of a class action. However, this unfair labor practice proceeding was in no sense a representative class action. Rather, general counsel attempted to prove, first, Kawano was prejudiced against the class of legal border area residents (because they were more apt to be union supporters than the illegals), and next

used that evidence of prejudice both to demonstrate antiunion animus and also to waive the requirement for each discriminatee of proof of actual reapplication. The issue we must resolve is not whether general counsel improperly utilized a class action format, but rather, whether the evidence is sufficient, first, to prove the existence of class discrimination, and second, to prove for each discriminatee he was not rehired primarily because of his union support.

■ We review the final Board order under Labor Code section 1160.8, to ascertain whether it is supported by substantial evidence on the whole record. (*Tex-Cal Land Management, Inc.,* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335 [156 Cal.Rptr. 1, 595 P.2d 579]; Lab. Code, § 1160.8.) ■ The record must contain relevant evidence which a reasonable mind might accept in support of the elements of the charge. (*Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474 [95 L.Ed. 456, 71 S.Ct. 456].) The elements of proof of an unfair refusal to rehire charge are the employee applied for an available position for which he was qualified and was unequivocally rejected, primarily because of union support. (See, e.g., *Gulf Shipside Storage Corp.* (1950) 91 N.L.R.B. 181; *The Linen Thread Co.* (1963) 141 N.L.R.B. 607; *National Labor Rel. Bd.* v. *Textile Machine Works* (3d Cir. 1954) 214 F.2d 929, 934.) (We note that N.L.R.B. precedent is directly relevant. Lab. Code, § 1148.) Proof of general company antiunion animus aids general counsel's burden of proof but is not in itself sufficient to prove the charge. (*N. L. R. B.* v. *Kingsford* (6th Cir. 1963) 313 F.2d 826, 831; *N. L. R. B.* v. *Eastern Smelting & Refining Corp.* (1st Cir. 1979) 598 F.2d 666, 669-671.)

FACTS

In 1975 Kawano was farming five ranches: San Luis Rey, Vandergrift East and Vandergrift West (Lomas East and Lomas West) Bonsall and Carlsbad.

Farming operations vary from season to season in response to changes in the produce market, decreases in land fertility after prolonged cultivation, and other factors. Normally a growing season begins around March, and labor needs commence then and grow steadily to a peak at harvest time, around July and August. Large numbers of workers are laid off routinely after the harvest and the work force shrinks to almost nothing by January. Hiring for the next season recommences in March.

All the testifying discriminatees were routinely laid off in January 1976, following the 1975 season. Kawano then withdrew from cultivation both Vandergrift West and Carlsbad. Acreage under cultivation was decreased from about 700 acres in 1975 to about 400 acres in 1976. Kawano's total payroll dropped from $2.5 million in 1975 to less than $1.4 million in 1976.

The crew at Vandergrift West consisted in September 1975, of 69 persons under the supervision of foreman Leopoldo Dagnino. All were laid off in January 1976, and only three members were rehired in 1976 and four in 1977. Sixteen of the discriminatees were members of this crew. According to Dagnino's testimony, virtually all his crew members were border area legals.

Only foremen and a few supervisory employees have permanent year-round jobs at Kawano. Other laborers are hired according to an informal in-the-field system, as follows: as a growing season gets under way, the foreman determines his need for labor and informs John how many workers he needs. Normally John authorizes him to hire them. The foreman then resorts to two sources of labor. Illegal aliens come directly to the fields and in fact camp there at times when their past experience indicates work will be available. They present themselves to the foreman and he has authority to hire them and does so. Legal aliens, however, live at greater distances, mostly in the border communities. Accordingly over the years they have developed their own transportation arrangement, referred to as a "raitero" system. The system is an employee-organized car pool. Drivers, or raiteros, are persons who have vehicles. These drivers have established pickup points, such as a restaurant called "The Donuts" in San Ysidro or a Jack In The Box in Tijuana. There workers seek out rides and pay the raitero to bring them to the Kawano fields. On arrival the foreman hires the carload of workers right at the fields, puts them to work, and obtains from the driver a list of their names for payroll purposes. The work being largely unskilled, there are no interview or screening procedures. Rather, the foreman authorizes the raitero, generally an old acquaintance, to bring a given number of workers, and when they arrive they are automatically put to work.

Before 1975, Kawano paid a ride subsidy of $1.25 a day to some workers. John testified he had no idea who was entitled to these subsidies. Although no evidence was presented of any formal company rule

or policy regarding entitlement to subsidies, circumstantial evidence indicates the subsidy was paid only or mainly to border area legals. Two foremen, Castellon and Dagnino, admitted they thought most of the legals getting ride subsidies were from the border area. No one denies the subsidy was never paid to illegals. Payroll data indicates 21 of the 52 discriminatees here were past ride subsidy recipients. In any event, after 1975, Kawano discontinued payment of this subsidy.

John testified he had a policy before 1975 of maintaining some minimum number of legals in the work force as insurance against border patrol raids depleting his work force at the peak of the season. Again, there is no evidence of any formalized company rule or policy setting some minimum number or percentage of legals. In practice, decisions about when to ask raiteros to bring legals, and how many to request, were left to the foremen in the fields as part of the informal hiring procedures at Kawano.

After the 1975 season, changes occurred at Kawano. First, the discriminatees testified without exception to the disappearance ·of their raiteros. Either they did not appear at all, or they refused to take workers, stating there was no work at Kawano. Only one raitero, Oscar Sanabia, a longtime Kawano employee who did not support the union, remained to drive workers from the Donuts restaurant to Kawano. He testified he was literally mobbed with requests for rides and for work after 1975 at the pickup point. He also testified John had authorized him to bring anyone, including union people, in his car load. The witnesses to the disappearance of the raitero system include not only Sanabia, but also drivers,. who testified foremen told them not to bring workers, and workers who could not find rides. Further, concurrent with the breakdown of the raitero system, many workers attested to their understanding Kawano was no longer hiring Tijuana legals. Putting aside the evidentiary respectability of the testimony, most of which was hearsay, it is clear there existed a widespread rumor in the border community in 1976 about Kawano's supposed policy not to hire legals.

Most of the evidence of class prejudice was hearsay once removed. A number of workers testified foremen such as Dagnino or Castellon told them Kawano was no longer hiring Tijuana legals. Drivers testified the foremen told them not to bring workers. The workers they would have brought, of course, would be Tijuana legals. One witness only (Higuera) testified he, himself, heard John say he preferred not to hire

Tijuana legals any longer. Higuera claimed he was standing about two meters away from a group consisting of John, Harry and Oscar Sanabia, and John said he did not want the people from Tijuana because they were Chavistas.

The statistical evidence indicates the proportion of all legals in the Kawano work force was reduced approximately by half between 1975 and 1976. Also, the turnover of legals was greater: from 1975 to 1976, about 14.5 percent of illegals returned, compared to only 8.75 percent of legals. There is no evidence, however, of past turnovers for either class of employees, nor is there any comparative data to correlate reduction in percent of legals with reduction in acreage under cultivation, which also occurred between 1975 and 1976. Accordingly, although suggestive, the statistical data should be viewed with caution.[1]

We come to the individual testimony of the discriminatees. Not all of the 52 presented equally strong cases. Those individuals who have the strongest cases testified to all of the following: (1) they actively participated in the union organizing campaign of 1975; (2) they previously worked for Kawano before 1975 for at least two growing seasons, a fact

---

[1]Kawano offered a series of exhibits (respondent 12-15) demonstrating changes in the Kawano field population over the years 1975-1977. Those exhibits indicate in all years, employee numbers peaked in August, and in all years, both casuals and regulars were hired. The percentage of regulars in the work force decreased. Taking the peak month of August, for example, we have the following hirings:

| 1975 | Regulars | 354 |
|------|----------|-----|
|      | Casuals  | 495 |
| 1976 | Regulars | 65  |
|      | Casuals  | 216 |
| 1977 | Regulars | 137 |
|      | Casuals  | 274 |

Further, the figures set forth at respondent's exhibit 12-15 and GC exhibit 17 indicate the proportion of all legals in the work force was reduced approximately by half between 1975 and 1976. The statistics also show turnover among both legals and illegals from 1975 and 1976: approximately 14.5 percent of illegals returned in 1976 as compared to 8.75 percent of legals. But as the hearing officer noted, comparison of turnover carries little weight absent evidence of past turnover rates to establish if any consistent pattern exists. The hearing officer points out a useful measure of turnover would be to compare attrition of legals from 1974 to 1975 with turnover from 1975 to 1976, and further opines Kawano should have introduced such evidence (to prove nondiscrimination).

There is a total reduction in work force, from 2,049 in 1975 to 825 in 1976.

The question whether the percentage reduction in regulars over the three years is statistically significant is a question for an expert. The Board does not address that problem. Without an expert opinion in the record about the probability significance of this data it is not formal proof of anything, although it may suggest class bias against the regular employees. The weight to be accorded such proof is slight, in view of the fluctuating nature of Kawano's farming operations.

which establishes both their ability to perform to the employer's satisfaction and their ability in the past to compete successfully with the illegals for field work; and (3) they made persistent, strong efforts to get rehired. They did not stop with inquiries of raiteros at pickup points, but rather, got themselves to the fields, approached foremen, attempted to find John, or had the union write in letters on their behalf. The testimony of the "strong" witness told the following common story: some time between March and May of 1976, the witness looked for his driver at the customary pickup spot, but either could not find him, or was refused transportation because there allegedly was no work. The worker then got himself either to the fields or to the San Luis Rey office. At the fields, foremen such as Dagnino said there was no work. In some cases hostile confrontations developed: foremen told the workers to get off the ranch before John came or he would run them off.

The employees fared no better at the office. The office is small, manned principally by a payroll clerk (Stillwell) and a manager (Mizushima). Hiring had never been done through this office in the past and the personnel there spoke little Spanish. No waiting list for work was maintained there except a small list for the packing shed, a miniscule source of work. When the employees came to the office, Stillwell told them she could not hire them, and advised them to look for John to get work. If they insisted she put their names on the packing shed list, which some of them may have mistakenly believed was a work waiting list for the fields.

Efforts to contact John were likewise futile. Dozens of workers testified to efforts to confront him. They waited for hours near the office or near various ranch gates or followed his car in the fields when they could. They never succeeded in waylaying him, except for a few who were told there was no work.

A number of employees had UFW volunteer workers write letters to the office on their behalf applying for work. To these letters, office manager Mizushima sent a standard form reply letter which said Kawano did not notify past employees of available work by mail or telephone, nor maintain a waiting list, but rather, hired "from those applicants who present themselves at times when work is available," i.e., at the fields on an ad hoc basis as need. The necessity to prepare this mimeographed form letter indicates how widespread was the unemployment problem at Kawano.

A representative sample of the testimony of the "strong" witnesses is that of Juan N. Rodriguez. He claimed he tried to get work after January of 1976 at the Kawano office, to no avail. Then he confronted Oscar Sanabia, the one remaining raitero, at the Tijuana Jack In The Box. Oscar refused to take him, saying Johnny Kawano did not want people from Tijuana. Likewise, Ramon Bravo testified his former driver, Jose Adame, told him on eight occasions in 1976 "they didn't want people from Tijuana right now." Maria Mendez' testimony was especially damaging. She had been a permanent year-round Kawano employee from 1968 until her layoff in January 1976. During the summer of 1975 John had offered her insurance papers to sign providing employee benefits which Kawano was tendering to its employees during the progress of the union organizing drive. According to Mendez, John told her it was to her benefit to sign because she had many years on the job and needed her job more than many since she was a single woman with children to support. Later her foreman, Joaquin Haro, told her she should move from her San Ysidro residence to Oceanside to keep her job because Kawano would not give work in future to Tijuana and San Ysidro persons because they like to rebel and are involved in Chavez' union. After 1976 she was never rehired. Likewise, Aurelio Higuera claimed he heard John say he did not want Chivistas from Tijuana, and also claimed his foreman, Dagnino, told him the boss did not want Tijuana legals.

Also corroborating the witnesses' testimony of futile attempts to find work is the testimony of Oscar Sanabia, a witness for petitioner, who admitted he was literally mobbed with requests for work and questions about the work situation at his pickup point in San Ysidro. He testified to the decreased availability of work. He did, however, deny the existence of systematic exclusion of "legals" to his knowledge, and testified John authorized him to bring anyone in his vehicle, including union people.

Among the strong witnesses were the "cherry crew" discriminatees. The facts are, on July 18, 1977, petitioner rehired three strong union organizers, Jose Aleman Juarez, Refugio Vasquez and Antonio Zamarripa. He assigned them to the Bonsall ranch where foreman Juan Rodriguez assigned them to a cherry tomato field. They had never done this work before; it was arduous and was traditionally reserved for the illegals, a fact John admitted. Further, they were isolated there from the other workers, and needed, but did not get, additional help. On Au-

gust 2, 1977, Javier Acosta and Felix Hernandez were reinstated at Kawano as the result of another unfair labor practice proceeding and were added to the cherry crew. All five testified the work was too much for five men and they were constantly harrassed and hurried along by their supervisor.

In addition to the testimony of the discriminatees, general counsel relied in part on testimony of petitioner's witnesses. Foremen Dagnino, Castellon and Haro all admitted their antiunion feelings before the election. Also, John himself, admitted on the stand he had a "feeling" the regulars (legals) supported the union in greater number than the casuals (illegals), and he was against having the union represent his employees. This evidence corroborates workers' testimony the foremen and John avoided them and made it impossible for them to get work. Further corroboration consists of testimony of union volunteer worker Alex Beauchamp, who claimed Castellon stood near the illegals while Beauchamp attempted to speak to them, making them fearful and unresponsive. Beauchamp testified Castellon was surly and uncooperative.

To recapitulate in summary, general counsel's evidence consisted of individual testimony of 50 witnesses who were laid off in the normal course of events at the end of the 1975 growing season and were not rehired. All were legal border area residents. Some were obvious union adherents and organizers and longstanding Kawano employees. In the past they came to work with raiteros. After 1975 they could not get rehired despite persistent efforts which in a practical sense exhausted all avenues of approach open to them. The other witnesses differed from the "strong" witnesses either in length of prior service with Kawano, persistence of effort to get rehired, or union affiliation. In addition to testimony of these discriminatees, there is hearsay evidence John said he would no longer hire Tijuana legals because they were union adherents. Further, there is evidence the percentage of legals in the work force decreased after 1975. Also, one admittedly all-legal crew, that of Dagnino at Lomas West, was not rehired almost in toto. Finally, the record indicates admitted antiunion attitudes on the party of key foremen, Dagnino, Haro and Castellon, as well as on the part of John.

Since we review the whole record, we now examine Kawano's case. First, John testified the reason most discriminatees could not find work was there was less of it available, due to the following changes: decrease in acres under cultivation and number of employees on payroll; change from truck spraying of fields to helicopter spraying, and change from

pipe to drip irrigation, both changes eliminating jobs; and elimination of the ride subsidy, allegedly as a cost-saving measure. Also, Lomas West and Carlsbad were withdrawn from cultivation.

Next, John admitted a policy of increased reliance on illegal labor following 1975. He justified this change as follows: illegals are cheaper and he was concerned with cutting costs; and he had less need for "insurance" against United States Immigration and Naturalization Service (INS) raids because those raids decreased in frequency after 1975. The evidence indicates a dramatic decrease in number of illegals apprehended at Kawano from 1975 to later years. The INS took 848 workers in 1975, 69 in 1976, and 19 in 1977. In order to explain how he could foresee at the end of 1975 such decrease would occur, John offered these reasons: first, the ranches withdrawn from cultivation, Lomas West and Carlsbad, were most frequently raided by INS, whereas the ranches he began to farm in 1976, Ivy and Rancho Santa Fe, were less vulnerable to such raids. Further, the INS immigration checkpoint on Highway 5 at San Clemente was closed by court order in 1975 but reopened in 1976. Although Kawano argues here a correlation between the decreased raids and the reopening of the checkpoint, John never testified to having any direct knowledge of such relationship. Similarly, he testified illegals were more widely available in general after 1975, but again, does not explain the facts on which he bases this assertion nor indicate how he could know such situation would come about.

The record contains no evidence about INS raid policy, if any. Likewise, there is no evidence about numbers of illegals "available" at Kawano in any year other than John's opinion of greater availability after 1975.[2] John's explanation of his ability to forecast decreased bor-

[2]Some facts of general knowledge outside this record support Kawano's assumption of greater availability of illegals and also indicate some legitimacy of his sudden decision to cut costs. First, regarding the illegals, the devaluation of the peso in 1976 causing U.S. dollars to be worth more in Mexico, might have some relationship to influx of alien workers. Second, regarding the cost-cutting motivation, the statistics indicate 1975 was a bad year for farmers in general and particularly for growers of vegetables and field crops in California. (See Bank of America pamphlet, "California Outlook: Agriculture 1979," June 1979. Table 4 "Cash Farm Receipts in California 1972-1979" indicates receipts from vegetables rose only 6.2 percent from 1974 to 1975 and dropped 6.1 percent from 1975 to 1976, compared, e.g., with a dramatic 26 percent rise from 1973 to 1974. Field crops receipts rose 59 percent from 1973 to 1974, then dropped 13.3 percent in 1974, and only rose 18.9 percent in 1975. Receipts from all crops dropped 2.3 percent from 1974 to 1975, the only drop in the period reported. Accordingly, Kawano's testimony about 1975 being a bad year and about his independent

der raids is a possible hypothesis, but not a demonstrated fact; other plausible explanations exist.

Also, John testified three key foremen left Kawano shortly after 1975. Joaquin Haro, foreman at Vandergrift, left in January 1976 to run his own farm after 10 years' service at Kawano. Juvenal Zarate, a home ranch foreman, left in October 1975 to return to Mexico, after 10 years at Kawano. Pasqual Lopez, a home ranch foreman and irrigator, also left Kawano after 10 years, in November 1976, to return to Mexico. John's opinion was the inability to find work of some of the alleged discriminatees might be due to the loss of these foremen, since foremen undoubtedly favored acquaintances and family members when hiring, and those workers who had worked for any of the above foremen might be at a disadvantage when applying to new supervisors.

We have here summarized testimony whose transcription fills 24 volumes. It is difficult to convey the summation of that record to one who has not read it. The general impression is one of sudden, widespread, disastrous economic change as large numbers of legal border residents were thrown out of work following a bitter union contest. Yet the proof is elusive, difficult to unearth. Hiring and operating procedures at Kawano had always been off-the-record, unstructured, ad hoc. It is difficult to demonstrate past policies, let alone changes in those policies. It is even more difficult to show availability of work, as the union must in a rehire case, because of the complicating factors of reduction in acreage, reduction in work force, and cost-cutting attempts which, even if taken in response to the increased expenses of unionization, are nevertheless legitimate options so long as the employer is not solely motivated by antiunion animus. Further complicated is the alien labor factor. Availability of these workers cannot be precisely documented. Competition between legals and illegals had existed for years at Kawano. Before 1975, factors favoring legals had included their relative permanence and immunity to deportation, while the illegals had in their favor their willingness to do more work for less money. This malleability increased the illegals' competitive edge in 1975 when the legals emerged as the workers secure enough in their positions to take the risk of organizing and supporting the union. Then after 1975, Kawano admittedly began preferentially hiring from the illegals. Was this change primarily motivated by John's hostility to the prounion legals, or was it

decision to retrench the following year has some credibility. The coincidence of unionization in 1975 with the poor yields for that year makes proof of motive difficult.

mainly an economic response to changing conditions including the fact of union representation?

LAW

The legal rules defining our review of this matter are well established in Federal precedent, which is directly relevant under Labor Code section 1148. The question is whether a discriminatee was discharged, or refused reemployment, primarily because of his union affiliation or for the purpose of discouraging his exercise of union rights. ■ We review the order subject to these legal principles: the charging party has the burden of proving a prima facie case of unlawful motive for discharge or refusal to rehire, and if it does so, then the burden shifts to the employer to show a legitimate business reason for the act (*Mt. Healthy Board of Ed.* v. *Doyle* (1977) 429 U.S. 274 [50 L.Ed.2d 471, 97 S.Ct. 568]).

As was said in *N. L. R. B.* v. *Eastern Smelting & Refining Corp., supra*, 598 F.2d 666, 671: "We have put the *Mt. Healthy* principle in the past in terms that, if the employer has established a good reason, it is not to be charged unless its action would not have been taken 'but for' the improper motivation, words now to be found in the penultimate paragraph of the Court's recent opinion, following *Mt. Healthy*, in *Givhan* v. *Western Line Consol. School Dist.*, [439] U.S. [410], 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). *Givhan* held the employer entitled to this defense even though its improper motivation was the 'primary' one—an admitted reliance upon conduct which the Court found was constitutionally protected. However, using the *Mt. Healthy* and *Givhan* test, once the Board has shown a 'significant' improper motivation, the burden is on the employer to prove that it had a good reason, sufficient in itself, to produce the discharge. [Citation.]"

■ Further, focusing on the class discrimination theory, if an employer unequivocally and publicly promulgates his unconditional refusal to rehire a certain category of employees, proof of such promulgation excuses the need to prove individuals in the category made applications for rehire which under the circumstances have been futile. (E.g., *N.L.R.B.* v. *Valley Die Cast Corporation* (6th Cir. 1962) 303 F.2d 64; *Piasecki Aircraft Corp.* v. *N.L.R.B.* (3d Cir. 1960) 280 F.2d 575; *N.L.R.B.* v. *Anchor Rome Mills* (5th Cir. 1956) 228 F.2d 775.)

In *N.L.R.B.* v. *Valley Die Cast Corporation, supra*, 303 F.2d 4, affirmed findings of 71 discriminatory discharges and refusals to rehire. All the discriminatees were striking employees during a labor dispute with their union. The company promulgated through its officials a policy strikers who were on the picket lines would not be rehired. The opinion of the appellate court does not describe the specific mechanics of the promulgation. The court concluded, however, the findings of discriminatory discharge were supported despite the absence of evidence of individual applications for reinstatement in all cases. The court noted the seven employees who did reapply were informed by Valley officials no one would be returned to work who had been on the picket line.

Similarly, in *Piasecki Aircraft Corp.* v. *N.L.R.B., supra*, 280 F.2d 575, the court affirmed a finding of wholesale discriminatory refusal to hire 135 employees. Piasecki had taken over Bellanca Company but did not care to take over Bellanca's 135-member union work force. A condition of the purchase of Bellanca was Bellanca's layoff of its workers prior to acquisition. Then Piasecki began to advertise for and hire workers, but would not deal with the former Bellanca employees. Personnel officers during the interviewing procedure locked 60 Bellanca employees out of the interview lobby. Further, the evidence showed the union formally requested reinstatement of the Bellanca work force. The reviewing court stated because of the lockout in the lobby and the entire course of treatment of those workers, they were implanted with the firm conviction former Bellanca employees were not welcome to Piasecki and accordingly individual formal applications for rehire by each discriminatee need not be proved.

In *National Labor Relations Board* v. *Anchor Rome Mills, supra*, 228 F.2d 775, the Board had found a discriminatory failure to reemploy 35 former strikers. The reviewing court examined the sufficiency of evidence for each discriminatee and affirmed as to 21. The facts involved a textile mill with "hiring at the gate" practices, not unlike Kawano's method of hiring at the field. There was testimony officials and personnel officers of the employer made it clear no former strikers would be rehired. Nevertheless, the court reversed as to 14 on the basis of insufficient showing of unqualified application for work. For example, it was deemed insufficient to prove the employee made informal inquiries at the bus station and then got discouraged and sought no further, and it was likewise insufficient to go up to the gate, be informed by a cowork-

er "they aren't hiring" and then retreat. Even though a "no help wanted" sign was posted and the secretary on the premises stated to various employees the employer was not hiring anybody, such evidence was not enough. Rather, only those employees who contacted persons with authority to hire, such as personnel directors or assistants and asked for positions which were vacant and available to be filled, had proved their case. In the *Anchor Rome Mills* case, the testimonial evidence of employer unwillingness to hire strikers served to establish illegal motivation in refusing to rehire, but did not serve to establish, for each discriminatee, effort to seek reinstatement and availability of position. Those elements could only be established by direct proof, for each discriminatee, of an inquiry for work and its availability as well as the hiring of another to do the job.

■ Finally, a showing of disapportionate impact is evidence of discrimination. (See, e.g., *National Labor Relations Bd.* v. *Shedd-Brown Mfg. Co.* (7th Cir. 1954) 213 F.2d 163.) Thus, for example, the reduction in percentage of legals in the Kawano work force is some proof of discrimination.

DISCUSSION

### I. Charges of Discrimination: Refusal to Rehire

The Board here faced the difficult question whether Kawano's partial conversion to an illegal labor force was primarily motivated by antiunion animus, making it an unfair labor practice, or whether the change was motivated by economic cost-cutting considerations, making it a legitimate business decision which is not an actionable wrong. That question rests in the Board's area of expertise (*Universal Camera Corp.* v. *Labor Bd., supra,* 340 U.S. 474). ■ For those discriminatees who were longtime Kawano employees and active union supporters, and who applied for jobs in accordance with Kawano practice, the evidence clearly supports the findings of discriminatory refusal to rehire. Although other witnesses were recent employees, some only passive union supporters, and some who made little effort to find work, substantial evidence supports the Board finding these employees were unable to find work primarily because of the antiunion-based prejudice against "legals." That evidence consists of the proof of the many "strong" cases of undisputable unfair refusals to rehire.

## II.  Procedural Due Process Problems

Kawano has also raised a number of due process contentions. For example, at points throughout the hearing, general counsel was permitted to amend the charges by adding new discriminatees, thus increasing the employer's litigating burden during the hearing. Also, the ALO found the isolation of the cherry crew workers at Bonsall constituted an unfair labor practice, yet that charge was not made in the complaint. The evidence about the workers' treatment was indeed litigated to show general antiunion animus at Kawano, but not specifically charged as an actionable wrong in the moving papers and litigated from that standpoint. ■ Since, however, the matters were fully tried and there is no prejudice to petitioner apparent in the record, these matters do not warrant our denying enforcement to the Board order. (E.g., *N. L. R. B. v. Thompson Transport Co.* (10th Cir. 1970) 421 F.2d 154.)

## III.  Remedy

■ Remedial matters are peculiarly within the discretion of the Board and will not be reviewed in this court except where obviously punitive or beyond the Board's jurisdiction. (*Phelps Dodge Corp.* v. *Labor Board* (1941) 313 U.S. 177, 194 [85 L.Ed. 1271, 1283, 61 S.Ct. 845, 133 A.L.R. 1271]; *Fibreboard Corp.* v. *Labor Board* (1964) 379 U.S. 203, 216 [13 L.Ed.2d 233, 241-242, 85 S.Ct. 398, 6 A.L.R.3d 1130].) We assume in the backpay proceedings which will take place, the Board, in determining the probable hours worked in 1976 and 1977, will consider the Kawano labor force cutbacks during that time, as well as other mitigating circumstances.

The order is affirmed.

Staniforth, J., concurred.

COLOGNE, J.—I concur in the majority opinion statement of the law, but respectfully dissent insofar as the opinion upholds the entire order of the Board because I believe certain portions of the order lack evidentiary support.

Under the provisions of Labor Code section 1160.8, if there is substantial evidence based on the record as a whole, the decision of the Agricultural Labor Relations Board is conclusive (*Tex-Cal Land Man-*

*agement, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335 [156 Cal.Rptr. 1, 595 P.2d 579]). I can appreciate Kawano, faced with rising costs of labor, taxes and materials, was prompted to cut back on its operation. A change in operations motivated by financial or economic reasons is not an unfair labor practice (*N.L.R.B.* v. *Kingsford* (6th Cir. 1963) 313 F.2d 826, 830). The test which must be applied, however, is whether economics or the antiunion animus was the predominant motivation for the action. This is a factual question which is within the province of the Board to resolve. There was evidence of Kawano's enmity for the union. We are not at liberty to substitute our judgment for that of the Board.

The question remains, however, which employees were the victims of this unfair labor practice, and I do not believe we can summarily lump all the claimants into that category.

Those longtime employees who were active union supporters and applied for jobs in accordance with Kawano's hiring practices but were rejected because of their union activities are clearly entitled to the relief granted by the Board. I concur with the majority upholding the Board's order as it applies to those employees.[1]

The evidence in support of the Board's order is weaker in the case of a second class of claimants who were denied work because they made application at the San Luis Rey office. Kawano never hired at that location. As was pointed out by the majority, *National Labor Relations Board* v. *Anchor Rome Mills* (5th Cir. 1956) 228 F.2d 775, holds the employees have a duty to make application for work in accordance with the company's hiring practices. As in *Anchor Rome Mills*, Kawano had an "at the gate" hiring practice and the employees had an obligation to make their applications in accordance with that practice.

The evidence here, however, supports the conclusion applicants were misled, confused, intentionally misdirected or told to see an individual who never seemed to be available. This testimony supports the inference Kawano was intentionally providing barriers to make compliance with

---

[1]Those employees, according to the evidence most favorable to the board, include: Javier Acosta, Francisco Garcia, Julian Gonzales, Refugio Vasquez, Catalina Barrios, Aurelio Higuera, Maria Mendez, Ezequiel Pedroza, Juan N. Rodriguez, Felipe de la Vega, Elisa Flores, Teresa Gomez, Hilario Veloz Gonzales, Luis Chavez Gutierrez, Martin Mora, Jose Aleman Juarez, Antonia de Ortiz, P., Gerardo Ruiz, Jose Luis Vasquez and Maria Luisa Diaz.

hiring practice very difficult, if not impossible. Again, this is a factual question to be resolved by the Board. Viewing the evidence most favorably to support the Board's ruling, I am constrained to concur with the majority and uphold the board's order as it applies to this class of employees.[2]

There is, however, a third class of employees where the evidence is totally lacking in one or more respects that should preclude them from being within an aggrieved classification.

Four employees testified they *never made any application for work.* This group includes Antonio Aleman, Herminio Vela Hernandez, Felipe Luna V. and Carmen Ortiz Mercado. Some of these people asked the drivers if there was work and became discouraged. The drivers were clearly not hiring agents and were at best able only to pass on rumors as to hiring practices. They had no actual or ostensible authority as the employer's agent. There is no substantial evidence the claimants met the burden of showing they applied for an available position and were unequivocally rejected because of union affiliation (see *Indiana Metal Products Corp.* v. *National Labor Rel. Bd.* (7th Cir. 1953) 202 F.2d 613; *Interlake Iron Corp.* v. *National Labor Relations Board* (7th Cir. 1942) 131 F.2d 129, 134).

*Others* testified they applied—they did not *personally* testify—were in groups which applied.

Another subgroup within this class for which supporting evidence is totally lacking is the group for which *there is no showing they were involved in any union activity* to provide the basis for discrimination. These people did not even wear a union button which might provide notice of their sympathies. This group includes Vincenta L. Rios, Jose Arroyo and Josefa Ruiz.

Finally one person, Antonio Zamarripa, did not apply in 1976, and *when he did apply in 1977 he was hired.* He cannot claim discrimination.

---

[2]Those employees, according to the evidence most favorable to the board, include: Feliberta Escobedo, Juan Garcia, Ignacio Hernandez, Josefa Hernandez, Silveria Juarez, Miguel Rodriguez, Emma Saldana, Feliciano Rubalcava, Jose Sandoval, Jose Luis Montellano, Jesus Ramirez and Idelfonso Villa.

There is in addition a fourth class of employees for which a modified recovery only should be allowed, namely those cases in which there is no evidence that they applied for work in 1976, but they did apply in 1977. It cannot be said that for this group Kawano's discriminatory hiring practices affected them for the year 1976, since they had no personal knowledge—at least only rumor or hearsay—of any such practice at that time.[3] Their denial of work for 1977, however, would provide a factual basis for pay entitlement under the Board's findings for that year. This group includes Ramon Bravo, Martin Conriquez, Pablo David Fink, Gregorio Garcia, Luisa Garcia V., Mario Guerrero, Delfino Laros V., Antonio Mendoza, Maria Elena Perez, Juan Rios, Francisco Rubio V., Domingo Santos and Monica Zamarripa.

To apply a broad brush to these cases and allow everyone to benefit is, in my opinion, not supported by the evidence and totally unfair. To do this is to open the door for every unemployed worker in Southern California to receive compensation. I would modify the decision of the board to conform the remedy to the individual cases as supported by the evidence.

A petition for a rehearing was denied June 30, 1980, and petitioner's application for a hearing by the Supreme Court was denied September 17, 1980. Bird, C. J., did not participate therein.

---

[3]Several employees applied for work in 1976 and were rejected. The experience of that rejection in the earlier years could provide a basis for believing the rejection would come again in 1977, and these employees should of course be included in the first class entitled to full recompense.